James C. MARSHALL

v.

CINTAS CORPORATION, INC.,
and Steven R. Welch.

Court of Appeals of Tennessee,
at Nashville.

July 11, 2006 Session.[1]

Oct. 17, 2007.

Permission to Appeal Denied by
Supreme Court April 14, 2008.

---

1. On appeal, Marshall filed CD–ROM recordings of the four-day trial below, but did not file a written transcript of the trial. On January 4, 2007, Marshall was ordered to provide this Court with a transcript of the CD–ROM recordings to assist this Court in its review of the issues presented. In addition, the parties were ordered to file supplemental briefs containing references to the transcript. The Court did not receive all of the supplemental materials until July 2007.

James C. Marshall, appellant, pro se.

Jason M. Cohen and Jennifer J. Morales, Cincinnati, Ohio, and Julie–Karel Elkin, Nashville, Tennessee, for the appellees, Cintas Corporation, Inc., and Steven R. Welch.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

This is an auto accident case. In October 2000, the individual defendant was driving a truck owned by his employer, the corporate defendant. The truck rear-ended a vehicle which in turn rear-ended the plaintiff's vehicle. The plaintiff filed this lawsuit against the defendants for damages sustained in the accident. The plaintiff's complaint was later amended to assert a claim for punitive damages against the corporate defendant. The claim for punitive damages was dismissed by the trial court before trial. After a jury trial, the jury awarded the plaintiff approximately $108,000 for various types of damages on a detailed verdict form. The jury did not award the plaintiff damages for permanent impairment or for past or future loss of enjoyment of life. The plaintiff's motion for a new trial was denied. The plaintiff now appeals, claiming that no material evidence supported the jury's decision to not award him damages for permanent impairment and loss of enjoyment of life, that the trial court erred in dismissing his claim for punitive damages, and that the trial court made other reversible errors at trial. After a careful review of

the record, we affirm the trial court's decision approving the jury verdict.

The accident which is the subject of this lawsuit occurred on October 11, 2000. On that date, Defendant/Appellee Steven R. Welch ("Welch"), was driving a truck owned by his employer, Defendant/Appellee Cintas Corporation, Inc. ("Cintas"). Welch's truck rear-ended a Honda Accord, which in turn hit the back of the van driven by Plaintiff/Appellant James C. Marshall ("Marshall"), a construction worker. At the time of the accident, neither Marshall nor the other two individuals involved in the accident reported injuries to the police officer who investigated at the scene. Subsequently, however, Marshall sought treatment from several medical professionals for injuries allegedly sustained in the accident.

On October 3, 2001, Marshall filed this lawsuit, *pro se,* against Cintas and Welch (collectively, "Defendants") seeking damages for the injuries he sustained in the accident. On March 19, 2002, Marshall amended his complaint to add a claim for punitive damages against the Defendants.[2] The amended complaint did not articulate any intentional conduct by the Defendants. Rather, it stated that Welch was negligent in the operation of his vehicle, and that Cintas was "negligent in that it failed to adequately train it's [sic] employee in the safe operation of his company vehicle before assigning him to a delivery route not carefully mapped." Marshall further asserted that the Defendants' negligence "constitute[d] a wanton and willful disregard for the rights of the Plaintiff." At a later hearing, Marshall clarified that it was the conduct of Cintas, not the conduct of Welch, that justified an award of punitive damages, because Cintas had acted in reckless disregard for his safety by failing to ensure that Welch was compliant with Tennessee Department of Transportation ("TDOT") regulations. The Defendants' answer to Marshall's amended complaint asserted, among other things, that Marshall's complaint failed to state a claim on which relief could be granted. Marshall filed a motion for summary judgment on the issue of liability.

On November 1, 2002, the trial court conducted a pretrial hearing, Judge Hamilton V. Gayden, Jr., presiding. At the hearing, Judge Gayden ruled as a matter of law that the factual allegations in Marshall's amended complaint were insufficient to support his claim for punitive damages. Subsequently, Marshall filed a motion requesting that the court sustain the punitive damages claim and reconsider its earlier ruling. Judge Gayden denied this motion and reaffirmed the prior holding that Marshall had failed to allege facts that would sustain a claim for punitive damages. For reasons not clear in the record, Judge Gayden was replaced as the presiding judge by Judge Thomas Brothers sometime in September 2003. On February 18, 2005, Marshall filed a motion to alter or amend the trial court's dismissal of his punitive damages claims. On March 4, 2005, Judge Brothers conducted a hearing on the motion. After the hearing, Judge Brothers reaffirmed the denial of Marshall's request to assert a punitive damages claim, reiterating that Marshall had failed to allege facts that would support his claim for punitive damages.

Meanwhile, on August 14, 2003, the trial court entered an order granting Marshall's motion for summary judgment on the issue of liability. In its order, the trial court stated that the Defendants would "be al-

2. Marshall also added Stephanie Merryman, the driver of the Honda Accord, as a defendant in the amended complaint. Merryman subsequently was dismissed from the action on summary judgment, and Marshall did not appeal that dismissal.

lowed to produce admissible evidence on the issue of comparative fault on the part of the Plaintiff."

On January 16, 2004, Marshall filed a motion styled "Motion to Require Personal Attendance and Live Testimony Before the Court," to compel the Defendants' attorneys to appear and testify "as to the frequent and customary misrepresentations expressed in their pleadings and statements made in open court." In his motion, Marshall alleged that defense counsel had violated various rules of professional conduct, adversely reflecting on their fitness to practice law. On January 30, 2004, the trial court held a hearing on Marshall's motion and found that Marshall had abused the judicial process by filing a motion in order to attack the Defendants' lawyers. Consequently, the trial court ordered Marshall to pay $356, the Defendants' reasonable attorney's fees for responding to Marshall's motion. Marshall asked the trial court to reconsider this award of sanctions. Consequently, the trial court scheduled a hearing on May 14, 2004, to permit Marshall to "show cause why sanctions should not be imposed against him as a result of pleadings he has filed association with his" motion to compel the live testimony of defense counsel. On the scheduled hearing date, however, Marshall did not appear. Therefore, the trial court entered an order requiring Marshall to pay the Defendants sanctions in the amount of $356. Undeterred, on June 24, 2004, Marshall filed a "Declaration of Cause," asserting reasons why the sanctions should not be imposed on him. In deference to the fact that Marshall was proceeding *pro se*, the trial court held another hearing to give Marshall another opportunity to show cause why sanctions should not have been imposed. On July 16, 2004, the trial court entered an order requiring Marshall to pay the $356 sanction, again concluding that he "had no

factual or legal basis for the Motion to Compel Live Testimony of Defendant's attorneys," and he "had no legitimate purpose for said motion but instead filed this motion for improper motives, namely, to increase the costs of litigation and to harass defense counsel."

On April 4, 2005, the four-day jury trial commenced. Because the Defendants' liability had already been established by summary judgment, the trial proceeded on the issue of compensatory damages. At the outset of the trial, in its preliminary instructions to the jury, the trial court erroneously told the jury that "the Defendants have admitted fault." Surprised at hearing that the Defendants had "admitted fault," Marshall commented in his opening statement that he "came here this morning believing Cintas was still putting forth the defense that I was somehow at fault for this accident. This morning [Defendants] have changed their position." In response to this comment, defense counsel challenged Marshall in her opening statement, noting that, "Now, Mr. Marshall just told you here this morning he just found out there was going to be an admission of fault. I'll give you the date here, that's when that was went back to [Marshall], by me, . . . February 22 of 2002." The February 2002 document to which counsel was referring was an affirmative answer to a request for admission by Defendant Welch, which she then published to the jury.

Two days later, during the trial, defense counsel attempted to admit into evidence Welch's answer to the request for admission into evidence. Marshall objected, arguing that he would be unfairly prejudiced by admitting Welch's answer into evidence because it was not an admission of liability on behalf of all of the Defendants. Marshall thought that this evidence would tend to undermine his credibility, and he did not

"want to be branded a liar." The trial court acknowledged that "if there's a problem here it arises from the semantics I utilized at the beginning of trial about the defendant admitting liability.... A summary judgment was granted in favor of Mr. Marshall back in August of 2003." The trial court held that Welch's answer to the request for admission was inadmissible and commented that determining the proper semantics to be used was "a jury charge issue for me to think about." Ultimately, the trial court did not instruct the jury that the Defendants admitted liability; rather, it stated that "[i]t has been determined that the defendant was at fault and is liable for any injury the plaintiff may have suffered that was legally caused by the accident in question." The trial court denied Marshall's request for a more specific curative instruction.

Much of the evidence submitted at trial centered on Marshall's claim that the injuries he sustained in the accident were severe and permanent, impairing his ability to work resulting in past, present, and future damages. In response, the Defendants submitted substantial evidence to rebut Marshall's claims as to the nature and extent of his injuries and his resulting damages.

Marshall testified at trial on his own behalf. Because he represented himself, his direct examination consisted of a narrative describing, among other things, the extent of his injuries arising from the accident. Marshall said that, prior to the accident, he had been self-employed in the construction business for over twenty-five years. He said that he "had been hit pretty hard" in the accident. After the accident, the construction company for which he was working terminated his employment, and he began to take odd jobs in construction, including some painting jobs. Marshall said that he experienced pain when he worked, but he had hoped that the chiropractic treatment he received would resolve the pain. He received treatment from Dan C. Jackson ("Dr. Dan Jackson") and his father, Bobby R. Jackson ("Dr. Bobby Jackson"), both chiropractors at Jackson Chiropractic. Marshall's treatments at Jackson Chiropractic, however, did not resolve his issues completely. After the treatment at Jackson Chiropractic, Marshall said, he continued working in construction, building decks, putting siding on homes, and the like, but he experienced "quite a bit of pain" while doing so.

After a few months, Marshall sought treatment from another chiropractor, Steve Deunsing, D.C. ("Dr. Deunsing") because he was still experiencing pain in his back and neck. Marshall claimed that he could no longer perform certain household tasks, maintain his vehicles, play the guitar, or do other things he enjoyed. Despite receiving treatment by Dr. Deunsing for several months, Marshall said, he did not improve. Dr. Deunsing then referred Marshall to a neurologist, Jimmy Vernon Wolfe, M.D. ("Dr. Wolfe") for evaluation and pain management. Marshall felt that the injury to his nerves caused by the accident was permanent. He said that he feels pain every day, and that the injury to his nerves has affected every aspect of his life.

On cross-examination, Marshall acknowledged that, although he suffered whiplash in the accident, his head did not hit the steering wheel or windshield. He also conceded that he continued to work regularly after the accident. He explained that, because of the injuries he sustained in the accident, he had to hire people to assist him on jobs.

Several lay witnesses testified at trial. Officer James Grady, the police officer who came to the scene of the accident, testified that no one involved in the acci-

dent, including Marshall, claimed that they were hurt at the time he issued the traffic citation. Another witness, Eric Anderson, testified that he worked for Marshall on a construction project, and that Marshall complained of pain in his neck while they were working together. Anderson recalled that Marshall needed assistance and was somewhat limited in the work he could perform. The trial court also heard testimony from Helen Collins, who hired Marshall to add three rooms on to her house in early 2002. Collins testified that Marshall had pain in his neck and shoulders while he was working for her, and that his sons assisted him on the job.

Two witnesses testified as to Marshall's typical earnings. Harold Taylor testified that he hired Marshall for $16 per hour on one construction job and $17.50 per hour on another. Michael Hudson, the general contractor for whom Marshall worked just before the accident, testified that Marshall was paid $18 per hour for a forty-hour work week.

Marshall's son, Able Marshall ("Able"), testified at trial about his father's activities and his difficulties after the accident. Able said that he had worked with his father on construction jobs both before and after the accident. Able stated that, after the accident, Marshall needed assistance doing certain construction tasks that he had performed independently before the accident. In addition, Able said that, since the accident, his father had trouble working on his vehicle, playing the guitar, gardening, and playing with his grandchildren.

Much expert testimony was submitted by both sides at trial. The deposition of Dr. Dan C. Jackson at Jackson Chiropractic was read into evidence. Dr. Dan Jackson began treating Marshall on October 14, 2000, a few days after the accident. At that time, Marshall complained of pain in his neck and lower back on his left side, and he claimed that construction work aggravated his condition. He treated Marshall a total of eleven times.

Dr. Dan Jackson took x-rays of Marshall's back and neck. He diagnosed Marshall with a neck sprain/strain syndrome with cervicalgia, also known as whiplash, referring to it as "mild" whiplash. He noted that Marshall had a small wedge-shaped deformity near his neck and some bulging discs in his vertebrae, but opined that it was not likely that these conditions were caused by the accident because Marshall's whiplash was mild. He also stated that it was possible that, over time, Marshall's symptoms could worsen from the original condition. Dr. Dan Jackson also saw some arthritis on Marshall's x-ray, but characterized this as a preexisting condition that was apparently asymptomatic before the accident. He did not believe that Marshall needed to be referred to either a neurosurgeon or an orthopaedic surgeon. Dr. Dan Jackson did not find it necessary to perform grip or strength testing or range of motion testing on Marshall because he was moving adequately. Likewise, he did not evaluate Marshall for a permanent impairment. Dr. Dan Jackson said that Marshall improved with treatment, and he did not suffer severe whiplash as was depicted on a whiplash injury chart.

The deposition of Dr. Bobby Jackson at Jackson Chiropractic was also read into evidence at trial. Dr. Bobby Jackson first treated Marshall in December 2000. Dr. Bobby Jackson agreed with the diagnosis given by Dr. Dan Jackson. He was of the opinion that the pain for which Marshall was being treated was caused by the accident, but he agreed with Dr. Dan Jackson that the wedge-shaped bony growth on Marshall's neck was a form of arthritis and was not caused by the accident. He noted that Marshall's x-ray showed normal curve

of the cervical spine; from this he concluded that Marshall's whiplash was not severe. An MRI of Marshall's neck indicated that Marshall did not have a herniated disc.

Dr. Bobby Jackson stated that, by the end of February 2001, Marshall told him that he was no longer having any pain or difficulty. A week later, Marshall still was not experiencing pain. Therefore, on or about March 6, 2001, Dr. Bobby Jackson released Marshall from his care. As with Dr. Dan Jackson, Dr. Bobby Jackson said that he did not perform a grip test, range of motion test, or a manual muscle test on Marshall, because these tests were not necessary. In light of the fact that Marshall told him in March 2001 that he was no longer having pain or difficulty, he was of the opinion that Marshall's symptoms were not permanent. However, Dr. Bobby Jackson believed that the accident aggravated Marshall's preexisting condition of arthritis and disc bulges. Jackson Chiropractic's records indicated that Marshall sustained no permanent damage and that Marshall was "feeling fine" at the time he was discharged.

The deposition of chiropractor Steve Deunsing was read into evidence at trial. Dr. Deunsing first treated Marshall on July 12, 2001. After the initial visit, Dr. Deunsing treated Marshall three times a week for about a month; after that, the visits tapered down to once per month. Dr. Deunsing's treatment included times during which Marshall was doing a lot of construction-related activity.

Prior to his testimony, Dr. Deunsing reviewed the records of chiropractors Dr. Bobby Jackson and Dr. Dan Jackson, as well as other health professionals who treated Marshall. Dr. Deunsing noted that Marshall was treated by Whole Heath

Chiropractic in December 2000, and again in March and April of 2001, and received massage therapy on occasion by licensed therapists.[3] In Dr. Deunsing's opinion, this continued treatment was necessary in order for Marshall to progress. In his treatment of Marshall, Dr. Deunsing performed range of motion and muscle strength tests. From these tests, Marshall's records, and other observations, Dr. Deunsing concluded that there had not been much change in the condition of Marshall's left shoulder and neck from the time of the accident. He found that Marshall had muscle spasms in his back and shoulders. Dr. Deunsing referred Marshall for an MRI, which showed that Marshall had disc bulges in parts of his back. Dr. Deunsing opined that Marshall's injuries were consistent with a rear-end automobile collision, and that, assuming Marshall's complaints of pain and description of his symptoms to be true, the pain in his neck and back was caused by the accident.

Dr. Deunsing assigned Marshall a 10% whole body impairment and determined that his impairment was permanent. Dr. Deunsing testified that, if not for the October 2002 accident, Marshall would not have the permanent impairment.

The deposition testimony of the neurologist, Dr. Wolfe, was read into evidence as well. Dr. Wolfe testified that Dr. Deunsing referred Marshall to him for "long-term evaluation and pain management." Dr. Wolfe first treated Marshall on July 15, 2002, almost two years after the accident. Dr. Wolfe did not review the records of either Jackson Chiropractic or Dr. Deunsing, and therefore was not aware of Marshall's statements as to the chiropractors who initially treated him. From his treatment of Marshall, Dr. Wolfe found Marshall's complaints to be consistent with

---

**3.** The licensed therapists were Marshall's daughter and his daughter-in-law.

injuries resulting from a rear-end motor vehicle accident, and stated that, if Marshall's reports of pain were truthful, it was causally related to the accident. Dr. Wolfe reviewed the results of Marshall's x-rays and MRI and said that the bulging discs could have been caused by the accident. He opined further that it was "highly probable" that the wedge-shaped bony deformity was caused by the accident. He ordered Marshall to undergo an EMG (electromyography) to diagnose nerve damage or dysfunction. The test was positive for such damage in one area. Dr. Wolfe said that, in the absence of a positive EMG in the other areas, muscle weakness could nevertheless be present. He prescribed pain medication for Marshall and also advised him to take some over-the-counter pain medication.

Dr. Wolfe concluded that Marshall's pain was permanent in nature. He also determined that, in order to avoid aggravating his condition, Marshall likely needed to restrict his work and recreational activities. Dr. Wolfe gave Marshall an eight percent (8%) permanent impairment rating.

In addition to the other medical evidence, the deposition of the independent medical examiner, Robert Dimick, M.D. ("Dr. Dimick"), was read into evidence at trial. Dr. Dimick, an orthopedic surgeon, evaluated Marshall at the request of defense counsel and was asked to determine causation for Marshall's injury. Dr. Dimick did a physical evaluation of Marshall on March 28, 2003, and also reviewed Marshall's x-rays and MRI results. According to Dr. Dimick, the x-rays showed that Marshall's spinal contours were normal, and that he had no instability, no loss of structural integrity, and no decrease in muscle tone. The x-rays and the MRI showed multilevel degenerative changes,

or arthritis, in Marshall's neck and spine that Dr. Dimick said had been "going on for several decades." He noted that Marshall had neuropathy in his left elbow that was probably not a result of the accident. Dr. Dimick testified that there was weakness in some of Marshall's muscle groups, but said that this finding was compromised by his perception that Marshall put forth a less-than-optimal effort during the tests. Dr. Dimick stated that he saw no evidence of a traumatic injury to Marshall as a result of the accident.

Dr. Dimick assigned Marshall a 5% whole body permanent impairment. He said that 50% of this impairment was caused by the accident, and the remaining 50% was caused by pre-existing conditions. He conceded that this apportionment was arbitrary. Dr. Dimick said that the degenerative changes that existed before the accident may have been aggravated by the accident, causing symptoms to emerge. He opined that "[t]he motor vehicle accident cannot be said to have caused the entire problem."

Both parties submitted expert testimony on the issue of the economic damages suffered by Marshall as a result of the accident. Plaintiff submitted the video deposition testimony of Brian P. Sullivan, Ph.D. ("Dr. Sullivan"), a forensic economist with the Center for Forensic Economic Studies in support of his valuation of economic damages.[4] Along with colleague Jerome M. Staller, Ph.D. ("Dr. Staller"), Dr. Sullivan issued a report in July 2003 and a supplemental report in September 2003 which placed a value on Marshall's loss of earning capacity and his loss of household services resulting from the accident. To make these valuations, Dr. Sullivan and Dr. Staller reviewed Marshall's medical reports from Dr. Deunsing, Dr. Wolfe, and

---

4. Dr. Sullivan's video deposition was played for the jury.

Dr. Dimick. Marshall's loss of earning capacity was measured by reducing Marshall's work week by six (6) hours per week for the remainder of his work life, which Marshall claimed was the reduction of working hours that was due to the accident. The reports by Dr. Sullivan and Dr. Staller, including supplemental reports, were admitted into evidence.[5] According to their calculations, Marshall's economic loss totaled between $115,730 and $164,013.

On cross-examination, Dr. Sullivan acknowledged that neither he nor Dr. Staller reviewed any medical reports from Jackson Chiropractic in making their assessment. He presumed that, if Marshall had been released from care by Jackson Chiropractic with no restrictions, then he would suffer no future economic loss from the accident.

In order to rebut Marshall's expert on his economic damages, the Defendants presented the testimony of Reuben Kyle, Ph.D. ("Dr. Kyle"), a professor of Economics and Finance at Middle Tennessee State University. To prepare for his testimony, Dr. Kyle had reviewed all of the medical reports, including those from Jackson Chiropractic. He measured Marshall's loss of earning capacity for the year 2000 in the same manner as Drs. Sullivan and Staller. However, for 2001 forward, Dr. Kyle used Marshall's social security earnings report dating back to 1967 and his more recent tax returns in order to determine his average annual earnings for the previous five (5) years. Dr. Kyle calculated Marshall's average annual earnings for 2001–2006 to be $12,739. That average annual earnings figure was reduced by 15% over time, with

various adjustments.[6] Dr. Kyle explained that he used this method because of the drastic variability in Marshall's earnings, noting that his highest annual salary of $27,745 occurred in 1985, while in several subsequent years he had no earnings whatsoever. Dr. Kyle agreed that, if it was found that Marshall's symptoms resolved after his treatment at Jackson Chiropractic, then he would not suffer any future economic loss as a result of the accident. In the summary of his report, Dr. Kyle concluded that Marshall's estimated lost earnings and the value of household services, if any, would total $29,571.

At the conclusion of the testimony, the case was submitted to the jury. On April 7, 2005, the jury returned a verdict in favor of Marshall for $108,262, apportioned as follows: $18,250 for past pain and suffering, $10,000 for future pain and suffering, $12,572 for past medical care and services, $22,440 for future medical care and services, $15,000 for past loss of earning capacity, and $30,000 for future loss of earning capacity. The jury did not award Marshall any damages for permanent impairment or for past or future loss of enjoyment of life. The trial court entered a judgment on the verdict. Apparently dissatisfied with the verdict, Marshall filed a motion for a new trial and a motion for relief from the judgment; both motions were denied. From this judgment, Marshall now appeals.

Marshall raises several issues on appeal. He argues first that the trial court abused its discretion in requiring him to pay the Defendants $356 in sanctions for discovery abuse when the Defendants did not file a

---

5. The initial report indicates that Dr. Samuel J. Kursh, D.B.A., and Stephanie R. Thomas, Ph.D., both from the Center for Forensic Economic Studies, also participated in preparing the report.

6. The 15% amount was derived from Marshall's claim that his disability required him to work six less hours a week, or 15% of a 40–hour work week.

motion requesting such sanctions. Next, he argues that there was insufficient evidence to support the jury's finding of no damages for permanent impairment and past and future loss of enjoyment of life. Marshall also argues that the trial court committed reversible error in failing to issue a curative instruction to the jury regarding a misrepresentation he claims was made by defense counsel in her opening statement.[7] Finally, he argues that the trial court erred in dismissing his claim for punitive damages. We address each issue in turn.

■■■ We first address Marshall's argument that the trial court abused its discretion by imposing sanctions on him for discovery abuse when the Defendants did not file a motion requesting such sanctions. "Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial judges have the authority to take such action as is necessary to prevent discovery abuse." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 133 (Tenn.2004). The imposition of a sanction for abuse of the discovery process involves the exercise of the trial court's discretionary authority, and thus will be set aside on appeal only when the trial court has abused that discretion. *See Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn.1988). "An abuse of discretion occurs when the decision of the lower court has no basis in law or fact and is therefore arbitrary, illogical, or unconscionable." *Hooker v. Sundquist*, 107 S.W.3d 532, 535 (Tenn.Ct.App.2002).

Marshall argues that the trial court erred in imposing sanctions against him because the Defendants did not file a mo-

tion requesting such sanctions, as is required by Rule 11.03(1)(a); rather, the Defendants sought sanctions for costs and attorney's fees at the January 30, 2004 hearing in response to Marshall's motion to compel defense counsel to testify. Marshall argues that "Defense counsel's failure to file a motion for sanctions deprived Mr. Marshall [of] the 21 day period to withdraw or appropriately correct his motion...." He claims that the trial court "imposed the sanction upon [him] without notice and before he had been given a reasonable opportunity to respond." Moreover, Marshall insists that he had a valid basis for his motion to compel the live testimony of defense counsel. He continues to assert that counsel for the Defendants made material misrepresentations to the trial court and routinely engaged in unprofessional behavior.

■■■ To support his claim that the Defendants were required to file a motion for sanctions before sanctions could be imposed, Marshall relies on Rule 11.03(1)(a) of the Tennessee Rules of Civil Procedure. Under this Rule, a motion for sanctions must initially be served on the offending party; that party is then given twenty-one days in which to withdraw or correct its alleged misconduct before the motion for sanctions can be filed with the court. Marshall acknowledges, however, that Rule 11.03(1)(b) permits a trial court to impose sanctions on its own initiative when a party presents "pleadings, motions, or other papers to the court 'for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" *Fossett v. Gray*, 173 S.W.3d 742, 752 (Tenn.Ct.App.2004)

---

7. Marshall also argues that defense counsel's conduct required the trial court "to fulfill its disciplinary responsibility and inform the Board of Professional Responsibility of the Supreme Court of Tennessee" of defense counsel's conduct. Whether the trial court properly exercised its ethical duties is not a proper issue on appeal and will not be addressed in this Opinion.

(quoting Tenn. R. Civ. P. 11.02(1)); *see also Stigall v. Lyle*, 119 S.W.3d 701, 705–06 (Tenn.Ct.App.2003)). In such an instance, no motion for sanctions is required and, consequently, the party against whom sanctions are imposed is not given an opportunity to withdraw or correct his challenged pleading or other paper within the twenty-one-day window. Instead, the party subject to the potential sanction is simply granted an opportunity by the trial court to show cause why Rule 11.02 was not violated.

In this case, Marshall was given ample opportunity to show cause why sanctions should not be imposed on him in accordance with Rule 11.03(1)(b). After the sanction was initially imposed, the trial court scheduled a show cause hearing to give Marshall an opportunity to show why the sanction was not warranted. Even after Marshall failed to appear at this hearing, the trial court afforded him yet another opportunity to appear and defend his pleading. Under the circumstances, sufficient opportunity to show cause was given, and the trial court's decision to impose sanctions in the absence of a motion did not constitute reversible error.

■ Marshall also contends that the trial court's decision to impose sanctions constituted an abuse of discretion. The sanction was based on Marshall's motion to require defense counsel to appear and testify in open court. In its order of July 16, 2004, the trial court stated that the sanction against Marshall was based on its findings that he "had no factual or legal basis for the Motion to Compel Live Testimony of Defendant's attorneys," and that he "had no legitimate purpose for said motion but instead filed this motion for improper motives, namely, to increase the costs of litigation and to harass defense counsel." From a careful review of the record, we conclude that the trial court's

findings are well supported in the record, and that the trial court did not abuse its discretion in imposing sanctions against Marshall in the amount of $356.

■ Marshall next argues that the evidence did not support the jury's finding of no damages for permanent impairment, and that a $0 award for permanent impairment rendered the jury verdict internally inconsistent. Where, as here, "a trial court approves a jury verdict, appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn.Ct.App.1999) (citing Tenn. R.App. P. 13(d)). Appellate courts do not reweigh the evidence nor decide where the preponderance of the evidence lies. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn.2000). "Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment." *Overstreet*, 4 S.W.3d at 718 (citing *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn.1994)). In applying the "material evidence" standard, this Court must "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

■ As to Marshall's argument that the verdict was internally inconsistent, Tennessee follows the general rule that "verdicts which are inconsistent *and* irreconcilable must not be allowed to stand." *Milliken v. Smith*, 218 Tenn. 665, 405 S.W.2d 475, 476 (1966) (emphasis added), *cited in Lovell v. Sonitrol of Chattanooga, Inc.*, 674 S.W.2d 728, 731 (Tenn.Ct.

App.1983). On appeal, we must give the verdict "the most favorable interpretation and ... give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict." *Hogan v. Doyle*, 768 S.W.2d 259, 263 (Tenn.Ct.App. 1988) (quoting *Templeton v. Quarles*, 52 Tenn.App. 419, 374 S.W.2d 654, 660 (1963)). The verdict must be upheld if, after examining it, "the court is able to place a construction thereon that will uphold it." *Id.*

■ Here, a review of the jury's verdict is instructive. The detailed jury verdict form listed the different types of damages claimed by Marshall, and the jury awarded damages as follows:

**Non-Economic Damages**

| | |
|---|---|
| Past Pain and Suffering | $ 18,250 |
| Future Pain and Suffering | 10,000 |
| Permanent Impairment | 0 |
| Past Loss of Enjoyment of Life | 0 |
| Future Loss of Enjoyment of Life | 0 |

**Economic Damages**

| | |
|---|---|
| Past Medical Care and Services | 12,572 |
| Future Medical Care and Services | 22,440 |
| Past Loss of Earning Capacity | 15,000 |
| Future Loss of Earning Capacity | 30,000 |

| | |
|---|---|
| TOTAL JUDGMENT | $108,262 |

In its jury instructions, the trial court defined the categories and explained to the jury that each category was separate and distinct.[8]

Marshall argues that the record does not contain material evidence to support the jury's award of $0 in damages for "Permanent Impairment." He cites the testimony of Dr. Deunsing, Dr. Wolfe, and Dr. Dimick, who assigned him permanent impairment ratings of 10%, 8%, and 2.5%,[9] respectively. Marshall asserts that these experts' opinions regarding permanent im-

pairment were unrefuted by any other medical professional. He acknowledges the testimony of Dr. Dan Jackson and Dr. Bobby Jackson, but discounts it because neither of them evaluated him for permanent impairment. Therefore, Marshall maintains, their testimony does not rebut the testimony of the witnesses who assigned him a permanent impairment rating. Marshall claims that the jury, by making awards for future pain and suffering, future medical care, and future loss of earning capacity, must necessarily have found the existence of permanency to his physical condition. In essence, he argues that the jury's verdict is internally inconsistent because, in spite of giving him an award for future damages, it declined to award an amount of damages for permanent impairment.

In response, the Defendants insist that the testimony of Drs. Dan Jackson and Bobby Jackson in fact rebut the assignment of permanent impairment ratings by Drs. Deunsing, Wolfe, and Dimick. It is undisputed that Marshall was treated at Jackson Chiropractic during the months immediately following the accident. Dr. Bobby Jackson testified clearly that Marshall progressed during the treatment and was dismissed from further care at Jackson Chiropractic in March 2001 because at that time Marshall said he was "feeling fine." Drs. Dan Jackson and Bobby Jackson would not have performed permanent impairment assessments on Marshall in light of his apparent full recovery. The Defendants also point out problems with the testimony of the experts who assigned Marshall permanent impairment ratings. They note that Dr. Deunsing testified that

8. Neither party objected to the trial court's explanation of the elements of damage in the jury instructions.

9. Although Dr. Dimick assessed Marshall a 5% permanent impairment rating, he determined that only 50% of Marshall's disability was caused by the accident.

he could not state with certainty that Marshall's injuries were caused by the accident, because he was unfamiliar with Marshall's activities during the period of time between March 2001, the date on which Marshall was released from Jackson Chiropractic, and July 2001, the date on which Dr. Deunsing began treating Marshall. Dr. Wolfe admitted that prior to his testimony, he did not have access to Marshall's post-accident records, was unfamiliar with his treatment at Jackson Chiropractic, and was not aware that there were a number of months in which Marshall received no treatment at all. In light of the conflicting evidence, the Defendants argue, the jury's award reflected a credibility determination in their favor on this issue.

From our review of the record and of the jury verdict as a whole, we must conclude that the jury's allocation of damages is supported by material evidence in the record. The testimony of Dr. Dan Jackson and Dr. Bobby Jackson, indicating that Marshall was fully recovered when he was released from their care in March 2001, constitutes material evidence that Marshall's injuries were not permanent. Moreover, the jury was entitled to consider the shortcomings in the opinions of Drs. Deunsing and Wolfe in making their assessment of the credibility of all of the expert witnesses. Overall, the record contains material evidence from which the jury could reasonably attribute $0 damages to Marshall for permanent impairment.

■ We also conclude that the jury's decision not to award damages in the "Permanent Impairment" category, while granting an award for other future damages, does not render the jury verdict internally inconsistent. This Court has approved the use of a detailed verdict form

such as the one used in this case, because each type of damage is separate and distinct, and because the form "emphasizes the jury's prerogative to assign a separate monetary loss for each type of damages requested." [10] *Overstreet*, 4 S.W.3d at 715 (approving the use of itemized jury verdict form and determining that the verdict form does not prompt the jury to award duplicative, overlapping damages); *see also Flowers v. Turner*, No. W2001–01429–COA–R3–CV, 2003 WL 135055, *3 (Tenn. Ct.App. Jan.14, 2003); *Jackson v. Allen*, No. M2000–01673–COA–R3–CV, 2002 WL 661930, at *2 (Tenn.Ct.App. Apr.23, 2002). The detailed verdict form is intended as a guide for the jury; it does not require that the jury award damages to the plaintiff in each category listed on the form.

In this case, it appears that the jury credited some of the evidence presented by Marshall and some presented by the Defendants. In awarding Marshall damages for future pain and suffering, future medical care and services, and future loss of earning capacity, the jury apparently determined that the injury suffered by Marshall as a result of the accident would endure for some time in the future. This does not, however, require the jury to find that Marshall's injuries constituted "permanent impairment." Placing this construction on the jury's verdict, we cannot conclude that the verdict is "inconsistent and irreconcilable" on this issue. *Milliken*, 405 S.W.2d at 476.

■ Marshall also argues that there is no material evidence to support the jury's decision not to award him damages for past or future loss of enjoyment of life. However, the evidence presented by Marshall on this issue was vague at best. Marshall testified that, after the accident, he had difficulty doing tasks that he had

10. Neither party objected to jury verdict form in this case.

previously enjoyed, such as maintenance of his vehicles, playing the guitar, and some household tasks. Marshall admitted, however, that after the accident, he was able to continue working, albeit with some pain. Marshall's son, Able, testified generally that, after the accident, his father had more difficulty doing things he enjoyed, such as working on his vehicles, playing the guitar, gardening, and playing with his grandchildren. He did not specifically compare Marshall's ability to perform these activities before and after the accident. The lack of specificity in this testimony, coupled with the fact that Marshall was able to continue working without restriction supported a finding by the jury that he was able to engage in these leisure activities without restriction. Under these circumstances, we conclude that material evidence supports the jury's verdict, and that the verdict is not internally inconsistent. Therefore, we affirm the trial court's judgment entered on the verdict and its denial of Marshall's motion for a new trial on this basis.

Marshall also contends that the trial court committed reversible error in failing to give a specific curative instruction on defense counsel's comments during opening statements regarding Welch's admission of liability. Marshall claims that defense counsel, by presenting evidence that Welch admitted fault at the scene of the accident, insinuated that Marshall misled the jury when he claimed during his opening statement that, until that day, he believed that the Defendants were contesting fault. Marshall argues that the trial court should not only have given a specific curative instruction, it should have also instructed the jury to disregard any com-

ments made at the beginning of trial that cast doubt on Marshall's credibility.

 Whether to give a curative instruction under the circumstances is a matter within the trial court's discretion. *See State ex rel. Farmer v. City of Townsend*, No. 03A01–9306–CV–00200, 1993 WL 460336, at \*2 (Tenn.Ct.App. Nov.8, 1993). A verdict is not overturned on appeal on this basis unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R.App. P. 36(b); *see Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn.1987).

 In this case, Marshall was simply not entitled to the specific curative instruction he sought from the trial court.[11] The trial court properly instructed the jury according to the facts and the law, explaining that "[i]t has been determined that the defendant was at fault and is liable for any injury the plaintiff may have suffered that was legally caused by the accident in question." The comments made by defense counsel during opening statement neither portrayed Marshall as a liar, nor insinuated that he had misled the jury. The comments merely indicated a misunderstanding regarding whether liability had been admitted, clarified during the trial and in the jury instructions. Moreover, any such error in this regard would have to be seen as harmless and affecting the outcome of this case. The jury in fact held in Marshall's favor, awarding him over $108,000 for "mild" whiplash sustained in a relatively minor accident. Under all of these circumstances, we decline to overturn the jury's verdict on this basis.

---

**11.** For purposes of this appeal, we assume that Marshall properly preserved this issue for appeal.

Finally, Marshall insists that the trial court erred in dismissing his claim for punitive damages as a matter of law. He argues that the facts alleged in his amended complaint set forth facts supporting a claim for punitive damages, and that the evidence adduced during the discovery was sufficient to submit the issue of punitive damages to the jury. The Defendants claim that Marshall failed to preserve this issue for appeal, because the issue was not raised in his motion for a new trial.[12] The Defendants note that the trial court informed Marshall that he could make an offer of proof on this issue for appeal, but he did not do so. Even if the issue were properly before this Court, the Defendants maintain, the trial court correctly held that the factual allegations in Marshall's amended complaint were insufficient to support a claim for punitive damages.

■ While the Defendants raise serious concerns as to whether Marshall preserved this issue for appeal, we will address the merits of Marshall's argument. Here, the trial court repeatedly held that Marshall's factual allegations were insufficient to support his claim for punitive damages. Thus, the trial court dismissed the claim on the face of the complaint pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure. In reviewing such a decision, we must take all allegations of fact in the complaint as true and review the trial court's legal conclusions *de novo* with no presumption of correctness. *See* Tenn. R.App. P. 13(d); *see also Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

Marshall's amended complaint alleges that Cintas was "negligent in that it failed to adequately train it's [sic] employee in the safe operation of his company vehicle before assigning him to a delivery route not carefully mapped." He further averred that the Defendants' negligence "constitute[d] a wanton and willful disregard for the rights of the Plaintiff."

■ In Tennessee, punitive damages may be awarded "only in the most egregious of cases" where the defendant has acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances." *Id.* Marshall simply does not allege or describe any "willful or wanton" conduct in his complaint. Rather, he alleges that Cintas negligently failed to train Welch properly. Though the complaint later states that this negligence "constitute[d] a wanton and willful disregard for the rights of the Plaintiff," the factual allegations describe conduct that is mere negligence, not reckless or willful conduct. Marshall now argues that his claim for punitive damages is supported by the evidence adduced through the discovery process. However, if the evidence supporting a punitive damages claim was obtained through discovery, Marshall did not further amend his complaint to include factual allegations reflecting this evidence. The dismissal of this claim was pursuant to Rule 12.02(6); therefore, we are constrained to review the four corners of the complaint and determine whether the complaint states a valid claim for punitive damages. Because the

---

**12.** Rule 3(e) provides in pertinent part:
"[I]n all cases tried by a jury, no issue presented for review shall be predicated upon ... [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial...." Tenn. R.App. P. 3(e).

complaint does not allege or describe reckless or intentional conduct on the part of Cintas, we must affirm the trial court's decision to dismiss his punitive damages claim.

In sum, we find that the trial court did not abuse its discretion in imposing Rule 11 sanctions against Marshall; that material evidence supported the jury verdict and that the verdict is not internally inconsistent; that the trial court did not err in declining to give the specific curative instruction requested by Marshall; and that the trial court did not err in dismissing Marshall's claim for punitive damages on the face of the amended complaint. All other issues raised but not specifically addressed in this Opinion are either pretermitted by our decision or are not properly before this Court.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant, James C. Marshall and his surety, for which execution may issue, if necessary.