IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 14, 2017 Session

## CHRISTY L. BRADLEY, ET AL. v. LAURA BISHOP M.D., ET AL.

Appeal from the Circuit Court for Shelby County
No. CT-002977-13  Rhynette N. Hurd, Judge

———————————————————

No. W2016-01668-COA-R3-CV

———————————————————

This is a health care liability action wherein a trial by jury resulted in judgment for the defendants. Plaintiffs filed a motion for a new trial, asserting that: (1) the trial court erred in granting defendants' motions in limine, which restricted plaintiffs' ability to adequately cross-examine defendants' expert witnesses regarding the "best possible care"; (2) the trial court erred in granting defendants' motions in limine, which restricted plaintiffs' ability to present evidence relating to medical expenses; (3) the trial court failed to give a curative instruction after defendants' opening statement; and (4) the weight of the evidence was against the jury verdict. The trial court denied the post-trial motion and affirmed the jury verdict as the thirteenth juror. Plaintiffs appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY ARMSTRONG, J., joined.

Richard Glassman and Lauran G. Stimac, Memphis, Tennessee, for the appellants, Christy L. Bradley and J. Anthony Bradley.

William H. Haltom, Jr., Margaret F. Cooper, and Laura L. Deakins, Memphis, Tennessee, for the appellees, Laura Bishop, M.D. and Women's Care Center of Memphis, MPLLC dba Ruch Clinic.

## OPINION

### BACKGROUND

Prior to the events at issue in this case, in 2002, Plaintiff/Appellant Christy Bradley ("Ms. Bradley") had a blood clot in her portal vein,[1] which blood clot impaired her liver function. This condition required approximately three abdominal surgeries between 2002 and 2003, wherein a shunt was eventually inserted from Ms. Bradley's sternum to two inches below her navel. Although the injuries healed, scars developed. Thereafter, Ms. Bradley became a patient at Defendant/Appellee Ruch Clinic in 2004 for treatment of abnormal uterine bleeding.

From 2004 to 2012, transvaginal ultrasounds performed on Ms. Bradley at the Ruch Clinic revealed that she had a fibroid[2] in her uterus. The treating physician performed a conservative surgery called a hysteroscopic myomectomy[3] on Ms. Bradley on two separate occasions to remove the fibroid. Each time, this procedure would temporarily alleviate the bleeding. However, Ms. Bradley's heavy bleeding would eventually resume, and the fibroid would return. Ms. Bradley was also prescribed medication to treat the heavy bleeding issue, but this treatment was also unsuccessful. During these years, Ms. Bradley would either experience no period at all or, if she did experience a period, would bleed abnormally. Because of these bleeding issues, Ms. Bradley had difficulty conceiving a child and was referred to a fertility clinic.[4]

On August 24, 2006, the fertility specialist performed a laparoscopy[5] on Ms. Bradley to address the various disorders related to her ovaries. The report noted findings of "extensive adhesions of the bowel and omentum[6] to her abdomen with the pelvis noticed to be 'relatively free of adhesions. [7]'"

From early to mid-2012, Ms. Bradley's bleeding issues worsened. On or around October 2012, another physician at the Ruch Clinic performed a transvaginal ultrasound and diagnosed Ms. Bradley with another large fibroid. The physician at the Ruch Clinic referred Ms. Bradley to Defendant/Appellee Laura Bishop, M.D. ("Dr. Bishop," or, together with the Ruch Clinic, "Appellees"), a surgeon specializing in obstetrics and gynecology ("OB/GYN surgeon"), who recommended several options, including a

---

[1] A "portal vein" is "a vein from the small intestine that ramifies in the liver and ends in capillary-like sinusoids that convey the blood to the inferior vena cava through the hepatic veins." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 1425 (9th ed. 2013).

[2] A "fibroid" means "having fibers." *Id.* at 695.

[3] A "myomectomy" is "the surgical removal of muscle tissue." *Id.* at 1189.

[4] It appears that Ms. Bradley was eventually able to conceive. As of the date of trial, Ms. Bradley had a six-year-old child.

[5] A "laparoscopy" is "a technique to examine the abdominal cavity with a laparoscope through one or more small incisions in the abdominal wall, usually at the umbilicus."

[6] An "omentum" is "an extension of the peritoneum that enfolds one or more organs adjacent to the stomach." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 1265 (9th ed. 2013).

[7] An "adhesion" is "a band of scar tissue that binds anatomical surfaces that normally are separate from each other." *Id.* at 42. In addition, "[a]dhesions most commonly form in the abdomen after abdominal surgery[.]" *Id.*

hysterectomy. Ms. Bradley chose instead to attempt yet another hysteroscopic myomectomy to remove the fibroid conservatively; Dr. Bishop performed this procedure at the end of October 2012.

However, the hysteroscopic myomectomy did not stop the bleeding because it was found that the fibroid had grown into Ms. Bradley's uterine wall. Dr. Bishop thereafter recommended a laparoscopic robotic hysterectomy, which she described as the least invasive option with the fastest recovery time. It is undisputed that Dr. Bishop also informed Ms. Bradley of the possibility of converting to an open procedure during the surgery. After Ms. Bradley was given some time to consider her options, Ms. Bradley informed Dr. Bishop that she wished to proceed with the recommended procedure.

The hysterectomy occurred on December 26, 2012, at Baptist Memorial Hospital for Women. Although the surgery initially began as a laparoscopic hysterectomy, Dr. Bishop converted to an open hysterectomy rather than continue with the planned robotic procedure. Prior to the conversion, Dr. Bishop noticed a superficial cut on Ms. Bradley's colon.[8] At some point during the transition from the laparoscopic surgery to open surgery Dr. Bishop sought assistance from two different surgical teams. Dr. Bishop, however, made the decision to finish the open procedure herself by suturing the colon and removing the uterus without help from another surgeon once she determined that help was not readily available and that she was confident she could finish the procedure herself. In the days following the hysterectomy, Ms. Bradley's condition deteriorated. On December 29, 2012, Ms. Bradley was transferred to the ICU at Baptist East, and another surgeon, Stephen Behrman, M.D. performed an operation that revealed contamination of the abdominal cavity and a "through-and-through injury" of the small bowel, necessitating an "enterectomy[9] with primary anastomosis.[10]" Ms. Bradley stayed at the hospital for approximately three weeks. Ms. Bradley's medical records reveal that it took Dr. Behrman approximately three hours to "completely free up and delineate the small bowel" because of the "tremendous adhesions from the patient's prior surgery." Ms. Bradley was able to return to work in April 2013. According to Ms. Bradley, the injury and surgery resulted in three years of additional procedures, therapy, and disfigurement.

Ms. Bradley and her husband, Plaintiff/Appellant J. Anthony Bradley (together with Ms. Bradley, "Appellants") filed a health care liability action on July 13, 2013 against Appellees in the Shelby County Circuit Court.[11] The complaint alleged, *inter*

---

[8] As discussed, *infra*, Dr. Bishop testified that this cut was one of the reasons why she converted to an open procedure.

[9] An "enterectomy" is "the surgical removal of a portion of intestine." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 622 (9th ed. 2013).

[10] An "anastomosis" is the "surgical joining of two . . . bowel segments to allow flow from one to the other." *Id.* at 89.

[11] The complaint filed by Appellants originally identified four defendants: Dr. Bishop, the Ruch

*alia*, that Dr. Bishop negligently caused injury to Ms. Bradley's small bowel. The complaint also alleged that the Ruch Clinic was vicariously liable for Dr. Bishop's negligence. On August 12, 2013, Appellees filed an answer generally denying all material allegations.

During discovery, on August 20, 2015, counsel for Appellants deposed one of Appellees' expert witnesses, Thomas Stovall, M.D. The portion of Dr. Stovall's testimony relevant to this appeal is as follows:

Q: What is the standard of care for Dr. Bishop on the day in question?
A: What a reasonable and prudent doctor with the same training and background would have in this locale, in Memphis.
Q: Under similar circumstances?
A: Yes.
Q: And is that to do the best she can—
A: Oh, I think—
Q: —for the patient?
A: I think we always try to do the best we can for the patient.
Q: So then the standard of care requires that a physician like Dr. Bishop, under the circumstances in his case, do the best she can for the patient?
A: I don't believe the best she can is in the statute, no.
Q: What statute?
A: In the definition of what standard of care is legally.

\* \* \*

Q: Well, let's talk about all doctors in Memphis doing what Dr. Bishop was doing on the day of this event. Are all doctors required to do the best they can for their patients?
A: I believe so, but I don't believe that that's part of a standard of care definition.
Q: Well, how do you apply the standard of care to all doctors?
A: Well, because that's what a reasonable and prudent doctor, under similar circumstances, would do in that situation.

\* \* \*

---

Clinic, Diane Long, M.D., and Baptist Memorial Hospital for Women. On March 23, 2015, the trial court entered a consent order dismissing without prejudice the claims asserted against Dr. Long and Baptist Memorial Hospital for Women. Thus, our recitation of the facts will be confined only to claims against Dr. Bishop and the Ruch Clinic, the remaining defendants in the lawsuit.

Q: . . . [D]o you agree with me that all doctors, on the day that these services were rendered to [Ms.] Bradley by Dr. Bishop, should attempt as best they can to do no harm to the patient?
A: Yes. As best they can, yes.
Q: And that's every doctor?
A: Yes.
Q: And you agree with me that every doctor should do his or her best for the patient under the circumstances presented?
A: Yes.
Q: There's no exception to that, is there?
A: Not that I'm aware of.
Q: And there's no exception to do the best you can to do no harm to the patient, is there?
A: Not that I'm aware of.
Q: And you believe that Dr. Bishop did the best that she could to do no harm in this case?
A: Yes.
Q: And you believe that she, Dr. Bishop, gave the best possible care and services she could to [Ms.] Bradley under the circumstances?
A: Yes.
Q: And do you agree with me that a physician doing what she or he did involving [Ms.] Bradley, on the day in question, should be well trained and educated in the procedure before he or she attempts to do the procedure?
A: Yes.
Q: And they, he or she, the physicians, should do the best they can to know everything that he or she can in order to provide that best care to the patient?
A: Yes.
Q: And do you agree with me that physicians, on the day in question doing the services that Dr. Bishop performed on [Ms.] Bradley, should render the best care that that physician can for that patient?
A: Yes.
Q: There's no exception to that, is there?
A: Not that I'm aware of.

On September 30, 2015, Appellees filed several motions in limine, only two of which are relevant in the instant appeal. The first motion in limine sought to exclude any references to "best possible care" or the "best that they can" that had been discussed during the deposition of Dr. Stovall. The second motion in limine at issue sought to exclude evidence of medical expenses beyond those actually paid by Appellants, their immediate family, or any insurance provider.[12] On January 25, 2016, Appellants filed

_____

[12] The amount charged by the health care providers totaled approximately $400,000.00, but the

- 5 -

responses in opposition to Appellees' motions in limine. On February 16, 2016, the trial court granted both motions in limine in favor of Appellees. With respect to the first motion in limine, although the trial court forbade the parties from making references to "best possible care" or the "best that they can," Appellants were permitted to "make references to a physician's duty to exercise his or her best medical judgment and whether or not that medical judgment fell outside the recognized standard of care."

An eight-day trial began on February 15, 2016, and concluded on February 25, 2016. During opening statements, counsel for Appellees stated that the standard of care did not require "perfection," but noted that doctors "exercise their best judgment and they do the best they can." Counsel also referenced children dying of cancer at St. Jude. Following this statement, counsel for Appellants requested a curative instruction "generally stating that what jurors may or may not have done or experiences is not evidence . . . and that there will be no proof in this case about St. Jude or children with cancer." The trial court denied the requested curative instruction but informed the jury that arguments of counsel were not evidence.

Appellants then presented their case-in-chief. Ms. Bradley testified first. Ms. Bradley recalled that she would miss days at work because of her bleeding issues. Ms. Bradley described the extent of the bleeding, stating that she was "le[aving] a mess" onto seats and was "passing clots." Following the December 26, 2012 hysterectomy, Ms. Bradley testified that she had to endure the uncomfortable and painful treatment and physical therapy that she received during her three-week hospital stay. In addition, Ms. Bradley testified that the bowel injury she sustained after the December 26, 2012 hysterectomy necessitated additional surgeries, including a hernia repair. Despite Dr. Behrman's efforts to close the incision, Ms. Bradley stated that the skin on her stomach had not completely closed as of the date of trial.

Ms. Bradley also testified that taking care of her child and doing chores became more difficult following the hysterectomy but acknowledged that family members helped her with the adjustment. Ms. Bradley testified that as a result of her injuries stemming from the hysterectomy, her marriage became strained, she had to seek therapy for her depression, she became more withdrawn, she developed new gastrointestinal issues, and she gained more weight.[13] According to Ms. Bradley, the total amount that her insurance company has paid for her medical expenses in this case is approximately $146,000.00.

Mr. Bradley; Becky Davidson, a retired employee of Mr. Bradley; and Robin Nemati, Mr. Bradley's sister, all generally testified to Ms. Bradley's activity prior to the December 26, 2012 surgery and her decreased activity in the aftermath of the

---

amount actually paid by Ms. Bradley's insurance was approximately $160,000.00.

[13] Ms. Bradley admitted on cross-examination that she suffered from weight gain, sleep apnea, acid reflux, and hypertension prior to the hysterectomy.

hysterectomy. Mr. Bradley and Ms. Nemati testified that Dr. Bishop told them that another doctor made the first cuts on Ms. Bradley in an attempt to blame someone else for Ms. Bradley's bowel injury. Appellants also played a portion of Dr. Bishop's deposition for the jury where she admitted that she caused Ms. Bradley's bowel injury, possibly when she retracted the bowel away from the uterus during surgery.

Appellants also presented testimony from three expert witnesses: Eric Colton, M.D., an OB/GYN; Othon Wiltz, M.D., a colon and rectal surgeon; and Steven Berliner, M.D., a gynecologic oncologist and urogynecologist. Dr. Colton testified that Dr. Bishop first deviated from the standard of care by not offering a vaginal hysterectomy because, according to Dr. Colton, vaginal hysterectomies are the most minimally-invasive hysterectomy because it "allows for the shortest operating time, [allows for] the fastest recovery, and [requires] no abdominal incision." In addition, based on the existence of Ms. Bradley's known extensive bowel adhesions, Dr. Colton testified that Dr. Bishop did not exercise her best medical judgment when she proceeded with the laparoscopic procedure on December 26, 2012. Dr. Colton also believed that Dr. Bishop's placement of the trocar[14] caused the bowel perforation. Although Dr. Colton conceded that bowel perforations during these procedures are not by themselves determinative of a violation of the standard of care, Dr. Colton testified that Dr. Bishop's failure to recognize and treat the bowel injury at the time of the hysterectomy violated the standard of care.

Dr. Wiltz's testimony was limited to the appropriate placement of trocars.[15] According to Dr. Wiltz, Ms. Bradley sustained the bowel injury because Dr. Bishop improperly placed the initial trocar in an area where Ms. Bradley was known to have bowel adhesions. Although Dr. Wiltz concedes that bowel injuries occasionally occur, he believed that Dr. Bishop should have gone back and checked for such injuries.

Like Dr. Colton, Dr. Berliner testified that Dr. Bishop deviated from the standard of care by not offering a vaginal hysterectomy, which according to Dr. Berliner, offers a much lower risk of a bowel injury than any other approach. According to Dr. Berliner, the trocars inserted at the time of the laparoscopic surgery caused the injury to the bowel. Dr. Berliner, however, admitted on cross-examination that there is a recognized risk of perforating the bowl regardless of the type of hysterectomy performed. Moreover, Dr. Berliner believed that Dr. Bishop deviated from the standard of care in her decision to make a transverse—also known as a Pfannenstiel incision—as opposed to a vertical incision when she converted to an open procedure. The Pfannenstiel incision, according to Dr. Berliner, limited the visibility of the upper abdominal contents including the placement of the trocars and, as a result, Dr. Berliner believed that Dr. Bishop was unable

---

[14] A trocar is a "sharp, pointed rod that fits inside a tube" that is "used to pierce the skin and the wall of a cavity . . . in the body to . . . guide the placement of a soft catheter." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 1818 (9th ed. 2013).

[15] Dr. Wiltz is a colon and rectal surgeon; therefore, he did not testify to the standard of care of an OB/GYN surgeon. Dr. Wiltz, however, is familiar with the handling of laparoscopic procedures.

to determine whether the bowel had been "compromised." In addition, Dr. Berliner testified that Dr. Bishop violated the standard of care by not waiting for another surgeon to help with evaluating Ms. Bradley in the operating room and that she should have continued waiting despite the fact that the surgeons she attempted to call were unavailable. Dr. Berliner denied that there was any risk "in a healthy young woman[] to stay under anesthesia" until another surgeon became available.

On February 23, 2016, at the close of Appellants' proof, Appellees moved for a directed verdict, which the trial court ultimately denied. Appellees then presented testimony from four medical experts: Guy Voeller, M.D., a general surgeon; Diane Long, M.D., an OB/GYN; Dr. Bishop; and Dr. Stovall, an OB/GYN surgeon.

According to Dr. Voeller, a laparoscopic procedure was appropriate despite the presence of bowel adhesions in Ms. Bradley's abdomen. Dr. Voeller testified that, based on the location of Ms. Bradley's scars from prior surgeries, bowel adhesions are expected to be located in the upper abdomen rather than in the pelvis, where Dr. Bishop planned to operate. Dr. Voeller also testified that, had Dr. Bishop waited for a surgeon to come assist, the outcome would have been the same because the standard of care required that the assisting surgeon's involvement in the hysterectomy be limited to addressing the OB/GYN surgeon's concerns rather than exploring the bowel extensively. In Ms. Bradley's case, because Dr. Bishop was concerned about the colon injury sustained during the laparoscopic procedure, Dr. Voeller believed that Dr. Bishop would have only sought the assisting surgeon's assessment of the repair she made to Ms. Bradley's colon. Because no apparent evidence of injury to the small bowel existed, Dr. Voeller testified that the assisting surgeon would not have made incisions in Ms. Bradley's abdomen solely to search for a bowel injury because such action would increase the risk of creating a bowel injury due to the presence of extensive adhesions. Dr. Voeller further testified that leaving Ms. Bradley under anesthesia for an extended period of time would have increased the risk of clotting based on her medical history.

Dr. Long testified that she became involved in the case when a nurse contacted her as the on-call doctor out of a concern that Ms. Bradley's urine output had decreased on the first postoperative day. Dr. Long denied that this was a symptom of bowel injury. Dr. Long further testified that a nephrologist, an intensivist, and infectious disease specialist were all involved in Ms. Bradley's care during her hospital stay. When she examined Ms. Bradley on December 27, 2012, Dr. Long recalled that she found neither signs nor symptoms of a bowel injury. In addition, Dr. Long testified that the results of the computerized tomography ("CT") scan and ultrasound that she ordered that day revealed no bowel injury. Dr. Long testified that laparoscopic procedures can be done on patients with bowel adhesions and that she believed Dr. Bishop complied with the standard of care.

Dr. Bishop testified that Ms. Bradley was consistently bleeding from June 2012 to October 2012 despite efforts to control it with conservative surgery and different hormonal medications. As a result, Dr. Bishop described that Ms. Bradley's red blood cell count had decreased from twelve to nine in just one month in the fall of 2012, indicating that Ms. Bradley had lost a quarter of her blood volume. According to Dr. Bishop, a vaginal hysterectomy was not a viable option for Ms. Bradley based on her previous experience operating on Ms. Bradley and examining her anatomy; as a result, Dr. Bishop did not even offer it to Ms. Bradley as an option. Dr. Bishop proffered that a vaginal hysterectomy would require a blind incision to be made around the cervix in order to enter the abdomen, with a risk of injuring any organ within the vicinity. Dr. Bishop testified that she recommended the laparoscopic minimally invasive procedure because of Ms. Bradley's history with blood clotting disorder.

During the laparoscopic surgery, Dr. Bishop testified that she placed the first trocar to the left of Ms. Bradley's navel because her scar and therefore most of her adhesions were on the right side.[16] Shortly thereafter, Dr. Bishop noticed a tear in Ms. Bradley's colon. Dr. Bishop made the decision to switch to an open surgery because she wanted to repair the tear and because of the presence of adhesions. Although she paged for surgical help, no additional surgeon was available. According to Dr. Bishop, leaving Ms. Bradley under anesthesia for too long was dangerous given her history of blood clotting. As a result, Dr. Bishop testified that she repaired the colon and finished the hysterectomy herself because the uterus, located in the pelvis, was free of the adhesions that were prominent in Ms. Bradley's upper abdomen. Due to the fact that Dr. Bishop left the trocars in place while she proceeded with the open surgery, Dr. Bishop testified that she was able to lift the abdominal wall and look back to the location of the trocars and was satisfied that the trocars were not near the bowel. In addition, Dr. Bishop testified that this visual examination revealed no evidence of a bowel leakage. According to Dr. Bishop, the standard of care requires that the OB/GYN surgeon perform a visual examination in the operating area at the end of the surgery.

Dr. Bishop denied that any report ever indicated that the injury to the bowel was a "through-and-through cut" as suggested by Appellants; rather, the report indicates that it was a "through-and-through injury" which she contended could mean through the several layers of the bowel. Dr. Bishop pointed to a pathologist report of the perforated bowel, which described one hole, rather than two holes, consistent with her interpretation. Dr. Bishop opined that if there had been two holes, then the bowel contents should have begun to leak immediately, and the results of the CT scan that was performed the next day would have revealed the bowel injury. Dr. Bishop believed that the injury likely occurred when she retracted the bowel out of the way of the uterus and that the injury likely began as a small tear that enlarged over time. Dr. Bishop described the symptoms

---

[16] Dr. Bishop testified that the first instrument always goes in blindly, and then a camera is inserted so that the surgeon can visualize the next instrument coming down into the abdomen.

of a bowel injury to include fever, an elevated white blood count, a rigid abdomen, and vomiting the first day. However, Dr. Bishop testified that Ms. Bradley's symptoms two days after the hysterectomy were consistent with kidney problems and not a bowel injury. Dr. Bishop testified that the first evidence of a bowel injury occurred on the third postoperative day, when Dr. Bishop was called by the ICU doctor regarding Ms. Bradley's kidney function, with suspicion of flesh-eating bacteria. Dr. Bishop denied blaming anyone else for the injury and stated that she never disputed that she caused the injury.

Dr. Stovall testified that Dr. Bishop's preoperative care of Ms. Bradley conformed to the standard of care by examining Ms. Bradley's history and offering available options. Because all of other options had been tried unsuccessfully, Dr. Stovall contended that the only remaining option was to have a hysterectomy. According to Dr. Stovall, Ms. Bradley's laparoscopic hysterectomy was appropriate even given Ms. Bradley's adhesions because they were located in the upper abdomen and laparoscopic hysterectomies are performed in the pelvis below the abdomen. Dr. Stovall testified that, regardless of the type of hysterectomy, injury to the bowel is one of the most common risks that are encountered. As such, Dr. Stovall testified that a bowel injury does not necessarily mean that a doctor violated the standard of care, and it can occur even when a surgeon operates pursuant to the standard of care. In fact, Dr. Stovall testified that a bowel injury is not always recognizable when it occurs.

Dr. Stovall also testified that Dr. Bishop conformed to the standard of care in the steps that she took in performing the hysterectomy. Specifically, Dr. Stovall testified that the Pfannenstiel incision that Dr. Bishop used when she switched to the open procedure was appropriate and within the standard of care because it is the incision of choice for all obstetrical and gynecological surgery, providing the best visualization of the uterus in the pelvis. In addition, this incision is the safest incision in terms of healing and hernia prevention. Although Dr. Stovall believed that Dr. Bishop conformed with standard of care in placing the trocar near the navel in order for her to be able to look down into pelvis, Dr. Stovall opined that, in this case, Ms. Bradley's bowel injury could have occurred in one of two ways: (1) trocar placement; or (2) retraction of the bowel with a lap sponge. Dr. Stovall opined that the injury was more likely to have been caused by the trocar placement based on known statistics of how often such injuries occur.

Dr. Stovall further testified that Dr. Bishop conformed to the standard of care postoperatively, which requires that the surgeon make assessments and address any problems that could arise. Dr. Stovall believed that Dr. Long, the on-call doctor who took care of Ms. Bradley one-and-a-half days after the hysterectomy, went beyond the standard of care by ordering a CT scan even though no sign of a bowel injury had arisen. Moreover, Dr. Stovall testified that the results of Ms. Bradley's CT scan showed minimal fluid and "free air" consistent with having had recent surgery and revealed no indication of a bowel injury. Dr. Stovall admitted that, if a surgeon suspects an injury to the bowel

at the time of the hysterectomy, the surgeon would be required to "run the bowel" by touching and squeezing the bowel in order to check for cuts or discharge; however, Dr. Bishop never suspected an injury to the bowel in this case. Dr. Stovall contended that the first sign of a bowel injury occurred when Ms. Bradley developed increased pain and experienced drainage from her wound on December 29, 2012. Once the signs and symptoms surfaced, Dr. Stovall testified that Dr. Bishop conformed to standard of care by involving a general surgeon to address the issue.

At the conclusion of the proof, Appellees renewed their motion for a directed verdict, which motion the trial court again denied. After deliberations, the jury returned a verdict for Appellees, finding that Dr. Bishop "did not deviate from the recognized standard of care." In so finding, the jury never reached the issue of damages. Subsequently, Appellants filed a motion for new trial, which hearing was held on May 9, 2016. As required by Rule 3(e) of the Tennessee Rules of Appellate Procedure, Appellants' motion specifies all of the issues raised in this appeal. The trial court orally denied Appellants' motion for a new trial and entered a written order on May 27, 2016, reflecting the oral ruling.

## ISSUES

Appellants present the following issues for our review, which we have slightly restated and reordered:

1. Whether the trial court erred in denying Appellants' motion for new trial.
> a. The trial court abused its discretion in limiting the Appellants' cross-examination of the Appellees' OB/GYN expert, Thomas Stovall, M.D.
> b. The trial court abused its discretion in declining to give a curative instruction following counsel for the Appellees' opening statement.
> c. The verdict of the jury was contrary to the weight of the evidence.
> d. The trial court abused its discretion in limiting Appellants' proof of medical expenses.

## STANDARD OF REVIEW

This Court has previously set forth the standard of review in the context of the denial of a motion for a new trial as follows:

> Tenn. R. Civ. P. 59.02 affords a party a means to seek a new trial within thirty days after judgment has been entered. *See Whitworth v. Whitworth*, No. E2008-01521-COA-R3-CV, 2009 WL 2502002, at *5 (Tenn. Ct. App. Aug. 17, 2009); *see also Ferguson v. Brown*, 291 S.W.3d 381, 387 (Tenn.

Ct. App. 2008). Under Rule 59, a trial court is afforded wide latitude in granting a motion for a new trial, and this court will not overturn such a decision absent an abuse of discretion. *See Boggs v. Rhea*, No. E2013-02859-COA-R3-CV, 2014 WL 5780810, at \*7 (Tenn. Ct. App. Nov. 6, 2014); *see also Loeffler v. Kjellgren*, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994).

*Baugh v. Moore*, No. M2013-02224-COA-R3-CV, 2015 WL 832589, at \*4 (Tenn. Ct. App. Feb. 25, 2015).

## DISCUSSION

### Exclusion of References Similar to "Best Possible Care"

Appellants' first issue deals with the trial court's decision to limit Appellants' ability to cross-examine Dr. Stovall regarding the basis of his standard of care opinion, thereby excluding evidence that Appellants believed was relevant under the Tennessee Rules of Evidence. Under Rule 401 of the Tennessee Rules of Evidence, "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible unless a rule or law provides otherwise; however, evidence that is not relevant is not admissible. Tenn. R. Evid. 402. Even if the evidence is relevant under Rule 401, it could still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Decisions regarding the admission or exclusion of evidence are generally entrusted to the sound discretion of the trial court, *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015), and discretionary decisions are reviewed pursuant to the "abuse of discretion" standard of review. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Moreover, although lawyers should be permitted "wide latitude in the cross-examining of witnesses," the trial court may use its discretion to limit cross-examinations to "avoid unfair prejudice, confusion, or waste of time[.]" *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 2008). In explaining the abuse of discretion standard, this Court has stated:

A trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). Under this standard, we will not substitute our judgment for

- 12 -

the judgment of the trial court. *Id.* (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). The abuse of discretion standard "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,'" and therefore "'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Med[.], Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

*Allen v. Albea*, 476 S.W.3d 366, 373 (Tenn. Ct. App. 2015), *perm. app. denied* (Sept. 16, 2015).

Here, the trial court ruled that any references to the "best possible care" in Dr. Stovall's deposition were inadmissible because they did not comply with the standard of care as defined under Tennessee's health care liability statute. Appellants do not dispute that the "best possible care" is not the required the standard of care in a health care liability action in Tennessee. Rather, Appellants argue that, because Dr. Stovall based his standard of care opinion on whether Dr. Bishop gave the best possible care or did the best she could, Appellants should be permitted to cross-examine him on the underlying basis of his opinion. We agree that cross-examination of an expert regarding the basis of the expert's opinion may be both vigorous and broad. As we have previously explained:

> [O]nce an expert has given an opinion, he or she may be vigorously cross-examined to undermine the evidentiary weight of the opinion. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005); *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 426 (Tenn. Ct. App. 2006). Opposing counsel should be given broad latitude in their cross-examination. *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). Thus, cross-examination may be used to require an expert to disclose and explain the facts or data upon which his or her opinion is based. Tenn. R. Evid. 705; *State v. Thacker*, 164 S.W.3d 208, 228 (Tenn.2005).

*Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 197–98 (Tenn. Ct. App. 2008).

We cannot agree, however, that consideration of Dr. Bishop's best efforts formed the basis of Dr. Stovall's standard of care opinion. Despite Appellants' assertion otherwise, Dr. Stovall never testified at his pretrial deposition that the basis of his standard of care opinion rests on whether Dr. Bishop gave the "best possible care" or that she did "the best she could." Rather, Dr. Stovall testified that the standard of care required by statute in Tennessee is defined as "[w]hat a reasonable and prudent doctor with the same training and background would have in this locale[.]" Appellants' counsel, on the other hand, repeatedly alluded to the "best possible care," to which Dr. Stovall

- 13 -

steadfastly answered that the "best possible care" was not required by the statute. Thus, we note that the references to "best possible care" were not advanced by Appellees; rather, the Appellants interjected such references during the cross-examination of Dr. Stovall at his deposition.

Moreover, regardless of how the issue of best possible care was raised in Dr. Stovall's deposition, we conclude that the trial court did not abuse its discretion in excluding this evidence. As previously discussed, even relevant evidence may be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay[.]" Tenn. R. Evid. 403. The Tennessee Rules of Evidence also place limits on the admissibility of expert testimony—the testimony must "substantially assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Tenn. R. Evid. 702. Here, the excluded portion of Dr. Stovall's testimony creates serious confusion as to the proper standard applicable in this case and therefore does not substantially assist the jury in determining the dispositive question before it: whether Dr. Bishop breached the standard of care in her treatment of Ms. Bradley. As such, this evidence was properly excluded by the trial court.

In reaching this conclusion, it is helpful to first consider the law governing the standard of care in healthcare liability actions. Tennessee Code Annotated section 29-26-115(a) provides the following essential elements that a plaintiff must prove in order to prevail in a health care liability case:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a).[17] Thus. the law does not "presume that a health care provider acted negligently simply because a treatment was unsuccessful." ***Richardson v. Miller***, 44 S.W.3d 1, 15 (Tenn. Ct. App. 2000) (citing Tenn. Code Ann. § 29-26-115(c)) (1980)). This standard "judge[s the physician] by an objective community standard"

---

[17] In 2012, the Tennessee General Assembly saw fit to amend sections of the Medical Malpractice Act to change the term used to describe actions against doctors and hospitals for professional negligence from "medical malpractice" to "health care liability." *See* 2012 Tenn. Pub. Acts, ch. 798, § 1–59. The 2012 amendment to replace "medical malpractice" with "health care liability" had no substantive effect on the operation of the statute. Therefore, we will cite to relevant authority discussing the standard of care prior to the amendment.

rather than by a subjective standard. ***Richardson v. Miller***, 44 S.W.3d 1, 15 (Tenn. Ct. App. 2000).

Appellants agree that the "best possible care" and "doing the best she could" connote subjective standards.  As such, any testimony regarding the "best possible care" or Dr. Bishop "doing the best that she could" would require the jury to judge Dr. Bishop by a more arbitrary subjective standard than required by Tennessee law.   First, we note that any evidence of whether Dr. Bishop did "the best she could" has little bearing on whether Dr. Bishop acted with ordinary and reasonable case. In our view, a physician could very well "do the best that she could" and yet still fall below the statutory standard of care, while another doctor could fail to do his or her best and yet exceed the standard of care required in a health care liability case. *See* ***Ashe v. Radiation Oncology Assocs.***, 9 S.W.3d 119, 122 (Tenn. 1999) (noting that "resolution . . . under a subjective standard is premised elusively on the credibility of a [witness's] testimony" and that the "subjective standard engages in an abstract analysis"). Consequently, such evidence would only serve to confuse the jury, whose crucial task is to determine whether Dr. Bishop met the objective standard of care required under these circumstances.

Additionally, evidence regarding whether Dr. Bishop provided the "best care possible" imposes upon Dr. Bishop far too stringent a standard. As is evident from the above statute, the requisite standard of care does not require that a physician deliver the best possible care but rather "ordinary and reasonable care" under the circumstances. Tenn. Code Ann. § 29-26-115(a)(2); *see also* T.P.I. Civil § 6.12 (indicating in the title of the jury instruction in a medical negligence action that "Perfection [is] Not Required"). As this Court opined more than fifty years ago, the law "does not require perfect faculties or perfect use of existent faculties, but only 'ordinary care,' which presupposes a margin of error[.]" ***Coleman v. Byrnes***, 242 S.W.2d 85, 89 (1950). In contrast, evidence regarding whether Dr. Bishop failed to provide Ms. Bradley with the best possible care holds Dr. Bishop to a standard closer to perfection. Thus, expert testimony concerning whether Dr. Bishop did or did not give the "best possible care" to Ms. Bradley does not "substantially assist" the jury in the determining the question of whether Dr. Bishop's efforts fell below the requisite standard of care. Tenn. R. Evid. 702.

Furthermore, we have previously upheld the trial court's exclusion of a medical expert's testimony when the testimony refers to a standard that is "not analogous" to the standard of care applicable in the case.  ***Godbee v. Dimick***, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006) (holding that the trial court properly excluded testimony regarding the practice of "most spinal surgeons" because "the practice of the majority of physicians in a community is not analogous to the standard of care in a community" but that the trial court erred when it excluded testimony referring to the "generally accepted approach" and the "generally accepted practice" consistent with the standard of care); *see also* ***Hopper v. Tabor***, No. 03A01-9801-CV-00049, 1998 WL 498211, at *4 (Tenn. Ct. App. Aug. 19, 1998) (affirming the trial court's grant of summary judgment to defendants

- 15 -

because plaintiff failed to create a genuine issue of material fact when she presented only one expert's deposition testimony, and the expert failed to show his knowledge of the required standard of care in Tennessee). *But see **Griffith v. Goryl**, 403 S.W.3d 198, 210 (Tenn. Ct. App. 2012) (noting that the plaintiff's expert's one reference to what "the majority of" well-trained urologists would do in response to a single question related specifically to defendant's failure to obtain imaging studies "does not undermine the basis for his testimony or render his expert opinion untrustworthy" when the expert repeatedly testified to his familiarity of the requisite standard of care). Likewise, any testimony discussing the "best possible care" standard in this case is "not analogous" to the requisite standard of care because its application would impose a much higher standard on Dr. Bishop than required under Tennessee law.

Appellants nevertheless argue that the jury "heard only one side of a critical issue[,]" similar to the Tennessee Supreme Court's decision in *White v. Beeks*, 469 S.W.3d 517 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015). In support, Appellants note that Appellees made two separate references to "the best [she] can" at trial, while Appellants were precluded from making such references.[18] In *White*, the trial court limited plaintiff's expert's testimony by allowing the expert to discuss only the risks that actually materialized and allegedly injured the plaintiff. *Id.* at 521. The Tennessee Supreme Court ultimately held that the excluded testimony "had a significant effect on the jury's determination of whether [defendant] obtained [plaintiff]'s informed consent . . . and whether a prudent person in [plaintiff]'s position, adequately informed, would have consented to its use." *Id.* Unlike *White*, however, the excluded portion of Dr. Stovall's testimony in this case would not have had a significant effect on the jury's determination that Dr. Bishop met the requisite standard of care because Dr. Stovall unequivocally testified that Dr. Bishop not only complied with the requisite standard of care but that she gave Ms. Bradley her best effort and the best possible care under the circumstances. In our view, Dr. Stovall's excluded testimony would have only bolstered Appellees' case rather than Appellants'. Therefore, even if we were to assume that Appellees' references to "the best [she] can" constituted error in the trial court, Appellants still have not shown any reversible error—that but for the trial court's decision to limit their cross-examination of Dr. Stovall on the issue of whether Dr. Bishop gave the best possible care, Appellants would have prevailed. *See* Tenn. R. App. P. 36(b) ("A . . . judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Thus, we cannot conclude that in excluding Dr. Stovall's opinion of whether Dr. Bishop exerted her best efforts in the care of Ms.

---

[18] Specifically, Appellants take issue with the following references: (1) Appellees' counsel's reference to physicians "do[ing] the best they can" in opening statements; and (2) Dr. Bishop's unsolicited testimony that she "tried to do [her] best to take care of [Ms. Bradley] at every single step[.]"

Bradley, the trial court prevented the jury from hearing "both sides of th[e standard of care] issue" or in any way gave Appellees an unfair advantage.

Based on the forgoing, we conclude that the trial court did not abuse its discretion in precluding Appellants from raising the issue of "best possible care" during Dr. Stovall's cross-examination, and, as a result, the trial court did not err in denying Appellants' motion for a new trial on this basis.

### Curative Instruction Following Appellees' Opening Statement

Appellants also take issue with the trial court's alleged failure to give a curative instruction drafted by Appellants[19] following Appellees' opening statement, which Appellants purport improperly compared Dr. Bishop to the physicians at St. Jude and Ms. Bradley to the children with cancer. Specifically, Appellants take issue with the following statement, in relevant part:

> We all know—we've all been to doctors over the years and they exercise their best judgment and they do the best they can, and it does not always— you know, a few blocks from here they are trying to save—a miracle to save children's lives at St. Jude, and many times it happens, and many times today some children are going to die, okay? It's not perfection. It is not perfection.

After considering each party's arguments regarding the specific language of the curative instruction and determining that both parties made statements that were "on edge," the trial court opted to provide the jury the following general instruction:

> You have just heard the lawyers' opening statements, and I would like to remind you that those statements are not evidence in this case. The only evidence that is—that you're to consider in this case will consist of the sworn testimony of the witnesses who have testified both on the witness stand and by deposition, the exhibits that you'll receive that will be marked into evidence and any stipulations that the lawyers have agreed to. You are the sole determiners of the facts and you are to use the law as I instruct you. Is that—do you understand that?

---

[19] Appellants raised three issues with Appellees' opening statement at trial. However, on appeal, Appellants raise only a single issue regarding Appellees' opening statement—the reference to St. Jude. Appellants proposed the following curative instruction targeted at Appellees' counsel, in relevant part:

> Mr. Haltom referred . . . to children at St. Jude receiving medical care and they die regardless of the care. There will be no proof in this case about St. Jude or children with cancer. You should disregard those comments by Mr. Haltom.

We note that Appellants never moved for a mistrial following this general instruction.

In their brief, Appellants argue that "no steps were taken by the [trial c]ourt to cure the prejudicial effect [Appellees' opening statements] had on the [j]ury" even though the statements were "highly prejudicial to the Appellants." We respectfully disagree.

Even though the trial court did not adopt Appellants' exact wording of the curative instruction, as previously discussed, the trial court reiterated to the jury that opening statements are not evidence and that the jury must only consider the presentation of testimony, depositions, exhibits, and stipulations as evidence. "Opening statements 'are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.'" *State v. Gayden*, No. W2011-00378-CCA-R3-CD, 2012 WL 5233638, at *9 (Tenn. Crim. App. Oct. 23, 2012) (quoting *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978)). Thus, it is well-settled that "[o]pening statements are not stipulations or evidence." *Id.* (citing *Harris*, 574 S.W.2d at 732).

"Statements made by counsel can be cured by the use of curative instructions." *Oldham v. Pickett*, No. 01-A-01-9211-CV00441, 1993 WL 95590, at *2 (Tenn. Ct. App. Apr. 2, 1993) (citing *Mitchell v. Jennings*, 836 S.W.2d 575, 581 (Tenn. App. 1992)). "Whether to give a curative instruction under the circumstances is a matter within the trial court's discretion." *Marshall v. Cintas Corp.*, 255 S.W.3d 60, 75 (Tenn. Ct. App. 2007) (citing *State ex rel. Farmer v. City of Townsend*, No. 03A01–9306–CV–00200, 1993 WL 460336, at *2 (Tenn. Ct. App. Nov. 8, 1993). "On appellate review, we must presume that the jury has followed [the trial court's] instruction." *Payne v. CSX Transportation, Inc.*, 467 S.W.3d 413, 443 (Tenn. 2015) (citing *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 375 (Tenn. 2006)). "A verdict is not overturned on appeal on this basis unless, 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Marshall*, 255 S.W.3d at 75 (quoting Tenn. R. App. P. 36(b)).

Here, although Appellees' reference to St. Jude and children with cancer during opening statements is arguably indecorous, the trial court's choice of instruction effectively clarified any possible confusion that proof of St. Jude or children with cancer would be introduced during the course of trial. Nothing in the record shows that the jury did not follow the trial court's curative instruction to consider only the proof at trial as evidence rather than statements made by counsel in opening statements. Absent such proof, we must presume that the jury followed the trial court's directive to consider the evidence, rather than statements by counsel. *See Payne*, 467 S.W.3d at 443. Consequently, we cannot say that the trial court abused its discretion in its utilization of a general curative instruction rather than specifically castigating Appellees' counsel.

In addition, "appellate courts will not review the action of the trial court in refusing to grant . . . a new trial based upon improper argument of counsel 'unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment, which cannot be removed by the trial judge's sustaining the objection of opposing counsel, or unless we affirmatively find that such argument affects the results of the trial.'" *Volner v. Vantreese Disc. Pharmacy, Inc.*, No. 02A01-9712-GS-00298, 1999 WL 350899, at \*2 (Tenn. Ct. App. May 28, 1999) (quoting *Doochin v. U.S. Fidelity & Guar. Co.*, 854 S.W.2d 109, 116 (Tenn. Ct. App. 1993)). "Appellate courts have tended to reverse a trial court's refusal to grant a new trial 'where counsel's misconduct has been **persistent**.'" *Id.* (quoting *Doochin*, 854 S.W.2d at 116) (emphasis added). Here, we note that no testimony or other evidence pertaining to the reference to St. Jude was ever introduced during the nearly two weeks of trial. *See, e.g.*, *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008) (holding that, although the prosecutor's argument in closing argument stating that the victim begged for his life even though no such evidence was ever presented during trial, the jury was presumed to have followed the given instruction that arguments of counsel were not evidence and, as such, "had no effect on the verdict"); *State v. Barnett*, No. 240, 1987 WL 13451, at \*3 (Tenn. Crim. App. July 8, 1987) (affirming the trial court's denial of defendant's motion for a mistrial after he was convicted of aggravated sexual battery based on the state's "improper" reference to defendant's demand for fellatio from his wife because the reference was made only in opening statement, no testimony or other evidence at trial was presented to support such reference, and "the state's comments do not constitute evidence"). Appellate courts have previously held that a brief, isolated, albeit improper statement made by attorneys during the course of trial does not constitute reversible error where the trial court gave a curative instruction. *See, e.g.*, *State v. Crump*, No. M2006-02244-CCA-R3-CD, 2009 WL 723524, at \*37 (Tenn. Crim. App. Mar. 18, 2009) ("We note particularly that the statements made [in opening statements] were brief and were not a focal point[] [and] that the jury had been advised that the opening statements were not evidence[.]"); *Oldham v. Pickett*, No. 01-A-01-9211-CV00441, 1993 WL 95590, at \*2 (Tenn. Ct. App. Apr. 2, 1993) (noting that "one isolated question" during cross-examination which the trial court instructed the jury to disregard "was harmless error at best"). As such, we fail to see how one passing reference to St. Jude and children with cancer during opening statements, after which the trial court specifically instructed the jury to not consider opening statements as evidence, and which was not later mentioned during any of the almost two weeks of trial, had any effect on the jury's verdict. Moreover, as discussed more in-depth *infra*, material evidence exists in the record to support the jury's verdict. *See Cherry v. McCullough*, No. 02A01-9201-CV-00005, 1992 WL 379074, at \*5 (Tenn. Ct. App. Dec. 21, 1992) (holding that the trial court did not abuse its discretion in denying defendant's motion for a mistrial despite plaintiff's counsel's allegedly improper remarks during opening statements because "[t]he jury was specifically instructed that the opening statements of counsel were not to be considered as evidence" and enough evidence existed in the record to support the jury's verdict).

Additionally, as Appellees point out, Appellants never requested a mistrial once the alleged prejudicial statement was made. "The failure to . . . move for a mistrial is typically grounds for waiver of an issue on appeal." *State v. Lillard*, No. M2008-00575-CCA-R3-CD, 2009 WL 2951270, at \*7 (Tenn. Crim. App. Sept. 15, 2009) (citing *State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995)); *see also Oldham v. Pickett*, No. 01-A-01-9211-CV00441, 1993 WL 95590, at \*2 (Tenn. Ct. App. Apr. 2, 1993) (citing *Spain v. Connolly*, 606 S.W.2d 540, 544 (Tenn. Ct. App. 1980)) ("[F]ailure to request a mistrial as soon as its grounds are known results in waiver.").

Because of Appellants': (1) failure to show how one reference during opening statements, after which the trial court issued a curative instruction, affected the results of trial; and (2) failure to request a mistrial after Appellees' opening statements, we conclude that the trial court did not abuse its discretion by declining to issue Appellant's requested curative instruction in response to Appellants' objection. As a result, we hold that the trial court did not err in denying Appellants' motion for a new trial on this basis.

### Whether the Jury Verdict Was Supported by the Evidence

Appellants also argue that "the [j]ury's verdict for the Appellees was contrary to the weight of the evidence, and the trial court abused its discretion by not properly exercising its role as the thirteenth juror and granting a new trial." We will consider Appellants' argument as two separate issues as follows: (1) whether the trial court properly exercised its role as the thirteenth juror; and (2) whether material evidence supports the jury's verdict.

According to this Court:

> When acting as the thirteenth juror in considering a motion for a new trial, the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999). If, after weighing the evidence, the trial court is satisfied with the jury's verdict, the court must approve the verdict. *See Ridings v. Norfolk S[.] Ry. Co.*, 894 S.W.2d 281, 288 (Tenn. Ct. App. 1994). If, on the other hand, the trial court is not satisfied with the verdict, it must grant a new trial. *See id.* "The trial court's performance of its function as thirteenth juror must be performed without regard to and without deference being shown to the result reached by the jury." *See id.* at 288–89. An appellate court presumes the trial court properly performed its duty as the thirteenth juror when the trial court approves the jury's verdict without comment. *See id.* at 289. Where . . . the trial court makes comments regarding the verdict on the record, this Court examines such comments in order to determine "whether the trial court properly reviewed the evidence, and was satisfied

or dissatisfied with the verdict." ***Miller v. Doe***, 873 S.W.2d 346, 347 (Tenn. Ct. App. 1993). This Court may reverse the lower court's judgment and order a new trial only when the record contains statements that the trial court was dissatisfied with or disapproved of the jury's verdict or when the trial court absolved itself of or misconstrued its function as the thirteenth juror. *See **id.***

***Dickey v. McCord***, 63 S.W.3d 714, 718–19 (Tenn. Ct. App. 2001). "We cannot review the accuracy of the trial court's determination as thirteenth juror." ***Overstreet***, 4 S.W.3d at 718 (citing ***State v. Moats***, 906 S.W.2d 431, 435 (Tenn. 1995)).

Here, the trial court, at the hearing on the motion for a new trial, considered each argument advanced by Appellants, rejected each one in turn, and expressly "determined that the verdict is not contrary to the evidence as [thirteenth] juror." Nothing in the record suggests that the trial court either did not independently weigh the evidence or was dissatisfied with the verdict but nevertheless approved the verdict. Upon our review of the transcript of the hearing on the motion, there is nothing in the trial court's ruling or comments from which we can conclude that the court failed to properly perform its function as thirteenth juror; rather, the comments show that the court independently weighed the evidence and decided that the verdict was supported by the evidence. Further, nothing in the trial court's comments indicates any dissatisfaction with or disapproval of the verdict. As such, we cannot say that the trial court did not properly exercise its role as the thirteenth juror in its approval of the jury verdict.

Having determined that the trial court properly exercised its role as the thirteenth juror, we now turn to the issue of whether material evidence exists in the record to support the jury verdict. "It is well established that once a trial court has approved a jury verdict, the standard to be applied on appeal to review the jury verdict is stringent[.]" ***Shropshire v. Roach***, No. M2007-02593-COA-R3-CV, 2009 WL 230236, at *3 (Tenn. Ct. App. Jan. 30, 2009). Although Appellants' brief describes the standard as "the weight of the evidence," the Tennessee Supreme Court has articulated the standard that appellate courts must apply when a jury verdict is challenged:

> An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); ***Whaley v. Perkins***, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." ***Barnes v. Goodyear Tire & Rubber Co.***, 48 S.W.3d 698, 704 (Tenn. 2000) (citing ***Crabtree Masonry Co. v. C & R Constr., Inc.***, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall

neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009). Our Supreme Court has further provided:

> Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—the Court of Appeals' review of the verdict . . . is limited to a review of the record to determine whether the verdict is supported by material evidence. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980)[.] . . . Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). . . . The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119–20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id.* Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material evidence to support a jury verdict, the appellate courts must affirm it. *See* Tenn. Const. art. I, § 6; *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979) (quoting *D.M. Rose & Co. v. Snyder*, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 (1947)); *Crabtree Masonry Co.*, 575 S.W.2d at 5; *City of Chattanooga v. Ballew*, 49 Tenn. App. 310, 316–17, 354 S.W.2d 806, 808–09 (Tenn. App. 1961); *see also Grandstaff v. Hawks*, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000) ("We have a duty to uphold a jury's verdict whenever possible.").

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422–23 (Tenn. 2013) (some internal citations omitted).

As previously discussed, in a health care liability action, the plaintiff must prove each element, one of which includes whether "the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with" the standard of care for the profession. Tenn. Code Ann. § 29-26-115(a)(2). If there is any material evidence to support the jury's finding that "Dr. Bishop did not deviate from the recognized standard of care" for an OB/GYN surgeon, we must affirm. *See Meals*, 417 S.W.3d at 422–23.

In this case, Appellees presented substantial testimony from medical experts who testified that Dr. Bishop's care of Ms. Bradley conformed to the applicable standard of care preoperatively, during the hysterectomy, and postoperatively. Specifically, the jury heard evidence that Dr. Bishop conformed to the standard of care of an OB/GYN surgeon in her assessment of Ms. Bradley's medical history, in her recommendation to Ms. Bradley of the minimally invasive procedure, in her performance of the hysterectomy including trocar placement away from the areas known to have bowel adhesions, in her decision to proceed with the surgery when no assisting surgeon was available to help in order to minimize blood clotting risks, and in her recognition of a bowel injury and taking appropriate action on the third operative day once symptoms arose. The jury also heard evidence that bowel injuries are the most common injuries that can occur during a hysterectomy and that such injuries are not always immediately recognizable.

Although Appellants presented countervailing evidence suggesting that Dr. Bishop deviated from the standard of care by not performing a vaginal hysterectomy and by not examining the bowel immediately post-surgery in order to search for any perforation, it is not our prerogative to re-weigh the evidence presented or assess the witnesses' credibility. The jury chose to credit the evidence presented by Appellees. As such, taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and discarding all countervailing evidence, as we must, we conclude that the record contains, at a minimum, material evidence to support the jury's verdict.

Based on all of these circumstances, we conclude both that the trial court properly exercised its role as the thirteenth juror and that material evidence supports the jury's verdict. Therefore, we affirm the trial court's judgment entered on the verdict and its denial of Appellants' motion for a new trial on this basis.

### Limitation on Proof of Medical Expenses

Our disposition of the issues at this juncture is sufficient to uphold the jury's verdict that Dr. Bishop did not breach the applicable standard of care for an OB/GYN surgeon. Appellants' remaining issue concerning limitation of proof of medical expenses, or damages, is, therefore, pretermitted.

### Conclusion

Based on the foregoing, we affirm the Shelby County Circuit Court's denial of Appellants' motion for a new trial. Costs of this appeal are taxed to the Appellants, Christy Bradley and J. Anthony Bradley, and their surety, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE