IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 5, 2019 Session

### JOANNA L. GOLDEN, ET AL. v. CYNTHIA D. POWERS

**Appeal from the Circuit Court for Hawkins County
No. 09CV0131      Beth Boniface, Judge**

_____

### No. E2019-00712-COA-R3-CV

_____

This appeal concerns a jury verdict in a personal injury case. Joanna L. Golden ("Golden") was jogging in the dark early one morning when she was struck accidentally by a car driven by Cynthia D. Powers ("Powers"). Golden and her husband, Douglas K. Rice ("Rice") ("Plaintiffs," collectively), sued Powers in the Circuit Court for Hawkins County ("the Trial Court"), asserting various claims including negligence. The matter was tried before a jury. The jury found Golden to be 80% and Powers 20% at fault. Plaintiffs filed a motion for a new trial, which the Trial Court denied. Plaintiffs appeal to this Court arguing that the Trial Court failed to act as thirteenth juror and that the jury's allocation of fault was unsupported by material evidence. Plaintiffs argue also that the jury was prejudiced against them for their being well-off out-of-towners. We find, first, that the Trial Court independently weighed the evidence and acted properly as thirteenth juror. We find further that the jury's allocation of fault is supported by material evidence. Finally, Plaintiffs' claim of jury prejudice is speculative, at best. We affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Timothy K. Jones, Knoxville, Tennessee, for the appellants, Joanna L. Golden and Douglas K. Rice.

Leslie Tentler Ridings and Caroline Ross Williams, Kingsport, Tennessee, for the appellee, Cynthia D. Powers.

# OPINION

## Background

In June 2005, Plaintiffs and their children, residents of Miami, Florida, were vacationing in Hawkins County, Tennessee. One morning, Golden, vice-president of a realty company, went for a jog while it was still dark outside. Golden jogged southbound on the right side of Highway 70. At one point, Golden decided to cross the highway to run facing the traffic. She did not stop to cross; she simply glanced to see if any cars were coming. While crossing, Golden noticed a car moving northbound toward her. The driver of this car turned out to be Powers' former co-worker, James Smith ("Smith"). When Golden slowed to let Smith pass, she was struck accidentally by Powers, who was driving southbound in the right side lane. Golden was badly injured, suffering broken legs and a slew of other injuries requiring extensive rehabilitation. Golden wore neck, arm and leg braces for a period of time, and was confined to a wheelchair for a number of months. At the scene, Powers estimated that she had been driving 50-55 mph. The speed limit was 45 mph.

Plaintiffs sued Powers in the Trial Court. Plaintiffs asserted claims of negligence and negligence per se. Rice asserted a claim for loss of consortium. In support of his loss of consortium claim, Rice alleged "the loss of affection, companionship, care, assistance, attention, protection, and support of his wife, for which he is entitled to recover damages." Powers filed an answer in opposition, wherein she raised comparative fault and her bankruptcy as affirmative defenses. Powers also pled Golden's negligence per se based on a number of statutes related to pedestrians. The parties stipulated that Golden's medical expenses were $239,055.36.

In November 2018, many years after the underlying incident, this matter finally was tried. During her opening statement, Powers' attorney urged jurors: "Don't punish Ms. Powers for Ms. Golden's poor choices." Afterwards, at the bench, Plaintiffs' counsel requested that evidence of Powers' bankruptcy be admitted in order to rectify any harmful impact the statement had on the jury, that Powers would not be "punished" in any event as she was judgment-proof. However, the Trial Court declined to admit evidence of Powers' bankruptcy.

We next review the pertinent testimony from trial. Golden took the stand. Golden had returned to work full-time about a year after her accident, although she testified she has lingering pain and memory loss. On cross-examination, Golden testified about the collision as follows:

-2-

Q. In the morning of the accident that we're here about today, you were jogging on the right-hand side of the road, weren't you?
A. Yes.
Q. Okay. So you were running with traffic as opposed to facing traffic. Correct?
A. Correct.
Q. And on this particular day, you had never run on this particular section of Highway 70 in the past. Is that right?
A. Right.
Q. All right. And Highway 70, that is a two-lane road. Correct?
A. One lane each direction.
Q. One lane each direction.
A. Right.

***

Q. And it was still dark when the accident happened. Correct?
A. It was dark, uh-huh.
Q. You didn't carry a flashlight with you, did you?
A. No.
Q. So you didn't have anything like this that you could wrap it around your hand or hold it or anything like that, did you?
A. (Witness shakes head from side to side.)
Q. No?
A. No.
Q. You didn't carry, like, a cell phone that could help light your way?
A. No.
Q. Okay. Did you wear a headlight that you sometimes see runners wear, one similar to this that you can actually turn a light on, bright lights, strobe lights? You could wear it backwards too if you're going to run with your back to traffic. Did you wear anything like that?
A. No.

***

Q. No reflective material?
A. On my shorts, which are the top of my legs, and at three locations on my shoes, which were at the bottom of my legs, and at the top of me on my jog bra.
Q. Okay. But no bands that could have offered extra reflective lights?
A. I was not wearing any armbands, no.

-3-

Q. Or leg bands?
A. No.

*** 

Q. Okay.  And so when you made that decision [to cross], you had been running on the fog line, correct, the white line on the outside of the road, kind of between that and the edge of the road?
A. Right.
Q. Okay.  So when you made that decision to go across, you glanced over your left shoulder.  Is that correct?
A. Right, uh-huh.
Q. You never stopped; you just glanced?
A. I was moving, uh-huh.
Q. You were moving.
A. Right.  So I looked behind me.
Q. You glanced over your shoulder.
A. Right.
Q. And you continued to move into the roadway.  Is that right?
A. I did.
Q. Okay.  And so once you were in the roadway, when you were about two-thirds of the way across the lane, you saw the oncoming headlights.  Correct?
A. Right.
Q. And those were the headlights, we later know, of Mr. Smith, the witness.  Right?
A. Right.
Q. So when you saw his headlights, you sort of -- you continued to move, but you sort of slowed your pace, didn't you?
A. Right.
Q. You didn't turn around and run back to the side of the road that you just came from, did you?
A. No.
Q. And you didn't turn around and look behind you, did you?
A. No.  I was moving, still moving, forward.
Q. Okay.  Now, where you crossed, there wasn't any crosswalk there, was there?
A. There's no crosswalks on that road that I'm aware of, no.
Q. Was there an intersection?
A. What do you mean by an intersection?
Q. Well, where another road intersects with the road you were on.

A. I don't know if there was a driveway or -- I don't remember exactly.

Q. Well, I'm not talking about a driveway. Did you cross where there was another street?

A. No, not that I remember.

Q. And so as you entered the roadway, you were running at an angle down the roadway. Is that right?

A. I was running across, so if that's what you mean by at an angle, to the other side.

Q. Well, you didn't take a perpendicular route, did you? Do you know what I mean by "perpendicular"?

A. I do not.

***

Q. You didn't run straight across the roadway?

A. No.

Q. Okay. And you didn't stop before you entered the roadway and look to the left, then right, then left again before you entered the roadway, did you?

A. I was moving, and I looked behind me.

Q. Okay. So you didn't stop?

A. I was moving. Correct.

Q. Now, when you saw the approaching vehicle coming toward you, you were already in the lane of travel. Correct?

A. Right.

***

Q. And then you slowed in your lane of travel to allow that car to pass. Correct?

A. I was slowing down so the car would go past me. Right.

Q. And then after it passed you is when you were struck?

A. Yes.

Q. And you never heard Ms. Powers's vehicle behind you, did you?

A. I did not.

Q. And you never saw it before you were hit, did you?

A. No.

Q. And you never saw it because your back was to it. Correct?

A. It was behind me.

Q. So your back would have been to it?

A. Right. Well, actually, I don't know if it was my back or would have been my side by that time, because I was turned sideways.

Powers testified, as well. On the morning of the accident, Powers was driving to her sister's house. Regarding how the accident occurred and at what point she first saw Golden, Powers stated:

> Q. Okay. "I saw someone running." You saw a lady running southbound in your lane?
> A. Yes.
> Q. You also saw an oncoming car?
> A. Yes.
> Q. So you were going this way, and the other car was coming north toward you. Is that right?
> A. Yes.
> Q. Okay. You saw that car's headlights?
> A. Yes.
> Q. Did you see the car first or the lady running first?
> A. I saw the car first.
> Q. Saw the car first.
> A. I thought you were asking if that's what the statement was saying.
> Q. Well, I'm asking --
> A. When you say that did I see her, that I -- that's what the statement says?
> Q. No. I'm asking you, when did you see the lady?
> A. When she was on the hood of the car, coming onto the windshield.
>
> ***
>
> Q. Okay. And I believe the damage to the windshield knocked your rear-view mirror off?
> A. Yes, sir.
> Q. Okay. The car was totaled?
> A. Yes, sir.
> Q. Now, when you drove from your house three or four miles away to the scene of the accident, you were driving about the same speed. Right?
> A. I'm not sure what my speed was. It was an approximation.
> Q. What was it approximately?
> A. I really can't say, because I really didn't look at the speedometer. I mean, it was just an approximate thing.
> Q. What did you tell the officer?
> A. I told him 50 to 55.
>
> ***

Q. Okay. Ms. Powers, in all fairness -- I know you're trying to be truthful, and I respect that. Okay? You were looking at the other car as opposed to looking in your lane, weren't you, looking at the other car coming toward you?
A. I don't recall.

Plaintiffs' expert, Miami-based forensic consultant Dr. William J. Fogarty ("Dr. Fogarty"), testified that, had Powers been traveling 45 mph and in a normal manner, the accident would not have occurred. Dr. Fogarty explained the basis of his opinion:

> Well, for two reasons. The first reason is that at the -- assuming the 50 to 55 miles an hour, at a point in time when the vehicle was just coming -- starting to come down the hill, it's approximately 650 feet to the impact position. Given that distance of travel, at 50 to 55 miles an hour, there's a certain number of seconds go by. If you place that vehicle at the posted speed of 45 miles an hour, then there's a longer period of time to cover that distance at a slower speed. The longer period of time is over one second, which would allow the pedestrian in one second of movement, since the Smith vehicle has gone through, to simply leave the lane. The pedestrian only has to move a distance of about four feet, and a jogging rate is six feet per second. So under that condition -- that's condition number one -- that wouldn't have happened. Condition number two, had the driver been traveling at a speed of 45 miles an hour, then there would have been sufficient observation of the pedestrian in the headlights of that driver's vehicle to react in an average period of time and bring a vehicle to a stop or steer around behind to the right. So either one of two conditions, in my opinion, would be the accident would be avoidable.

Smith, the acquaintance of Powers who was driving northbound on the morning of the incident, testified. Smith saw Powers' headlights as he approached. Smith did not see Golden until he was "almost on top of her." Smith testified that Powers was driving at a normal rate of speed. As soon as the cars passed, Smith heard tires squealing and a scream. Smith acknowledged that his headlights were not in complete working order at the time.

R. Dale Farmer ("Farmer"), an accident reconstructionist, testified as an expert for Powers. Farmer estimated Powers' speed to have been 40 to 41 mph. Farmer testified that Golden had a better chance to see Powers than vice versa, and that, in his view, there was no way Powers could have avoided hitting Golden. Farmer testified:

Q. So what caused this accident?

A. This crash was caused by Ms. Golden running on the wrong side of the road and crossing into traffic without observing another vehicle coming.

Q. Was there any way for Ms. Powers to avoid striking Ms. Golden?

A. No.

Q. Was there anything that Ms. Powers should have done differently to avoid this accident?

A. She was not speeding. There was nothing else that she could have done that I have found.

On rebuttal, Dr. Fogarty disputed Farmer's speed calculations. However, when asked if it was safe to run in the dark in the middle of a road with a 45 mph speed limit, Dr. Fogarty testified "most of the time the answer would be no." At the conclusion of trial, the jury found that Golden was 80% at fault to Powers' 20%. The jury found that Golden had incurred $300,000 in damages, and Rice none.

In January 2019, Plaintiffs filed a motion for a new trial alleging that the verdict was against the greater weight of the evidence; the verdict was contrary to the law and the evidence; the verdict was based on prejudice and caprice; and, the Trial Court erred by disallowing testimony about Powers' bankruptcy. In March 2019, the Trial Court entered an order denying Plaintiffs' motion. The Trial Court stated:

> The Plaintiffs, pursuant to Rules of Civil Procedure 59.06 and 59.07, ask the Court to grant a new trial based on four grounds. The first ground is that the verdict was against the greater weight of the evidence. The Court finds that the evidence supports the verdict. Plaintiff admitted that at the time of the accident she was not running facing oncoming traffic. She attempted to cross the road without looking both ways and did not traverse in a crosswalk or an intersection. She admitted that the area was dark and her back was to oncoming traffic when the impact occurred. She was not wearing reflective arm or leg bands, reflective vest, clip-on light, headlamp or flashlight. She admitted to slowing her pace in the middle of the lane of travel with her back to oncoming traffic. She admitted to running on a road without a sidewalk or sufficient shoulder thereby forcing her to run in the lane of traffic on the wrong side of the road. The Defendant's expert testified that Defendant was traveling at or below the speed limit in her lane of traffic. At the time of the accident, it was dark outside limiting visibility.

> The second and third grounds for a new trial are that the verdict was contrary to the law and evidence and based upon prejudice and caprice. Plaintiff argues that the jury did not apply the law given in the jury instructions regarding the award of damages. Plaintiff posits that the jury

must have considered fault to reduce the non-economic damages due to the verdict of $60,944.64. The Court finds that the amount of non-economic damages is not amenable to an exact mathematical formula. The jury heard evidence that Ms. Golden returned to her work a few months after the accident and currently runs four miles a day. Although suffering a severe accident, to her credit, Ms. Golden did not require pain medications during her convalescence. Ms. Golden's head injury has not impaired her income or work position. The Court does not find that the amount of damages requires an additur. The Court also notes that whatever figure the jury could have found for non-economic damages is moot due to the fault allocation between the parties.

The fourth issue is whether the Court should have allowed testimony regarding Defendant's bankruptcy after Defendant's attorney asked the jury not to "punish" her client in her opening statement. The Court does not find that evidence regarding Defendant's bankruptcy was relevant to the case at bar. Evidence of the bankruptcy is not probative of liability or damages. Also, exposing the bankruptcy could confuse the jury as to fault and alert them to the fact that there was an insurance policy to compensate the Plaintiffs. The Court did give two curative instructions, first the blanket instruction that attorney statements are not to be considered evidence and secondly an instruction agreed upon by the parties that the Plaintiffs were not trying to punish Defendant as they had not asked for punitive damages.

Plaintiffs timely appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise two issues on appeal: 1) whether the Trial Court erred by failing to act as thirteenth juror; and, 2) whether the Trial Court erred by denying Plaintiffs' motion for a new trial.

Our Supreme Court has discussed the deferential standard of review in jury trial cases as follows:

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the

-9-

verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

With regard to a trial court's decision on a motion for a new trial, this Court has explained:

A trial court is given wide latitude in granting a motion for a new trial, and a reviewing court will not overturn such a decision unless there has been an abuse of discretion. *Mize v. Skeen*, 63 Tenn. App. 37, 42-43, 468 S.W.2d 733, 736 (1971); *see also Tennessee Asphalt Co. v. Purcell Enter.*, 631 S.W.2d 439, 442 (Tenn. App. 1982). As the thirteenth juror, the trial judge is required to approve or disapprove the verdict, to independently weigh the evidence, and to determine whether the evidence preponderates in favor of or against the jury verdict. *Mize*, 63 Tenn. App. at 42, 468 S.W.2d at 736. If the trial judge is dissatisfied with the verdict, he should set it aside and grant a new trial. *Hatcher v. Dickman*, 700 S.W.2d 898, 899 (Tenn. App. 1985) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)).

*Loeffler v. Kjellgren*, 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994). Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

We first address whether the Trial Court erred by failing to act as thirteenth juror. Plaintiffs argue that the Trial Court deferred to the jury without exercising any independent judgment as to the evidence. Our review of the order denying Plaintiffs' motion for a new trial leads us to disagree. In its order, the Trial Court found "that the evidence supports the verdict" and then articulated its basis for so concluding. While Plaintiffs take issue with the fact that all of the evidence cited by the Trial Court was favorable to Powers, this was the Trial Court's prerogative. Certainly there was competing evidence presented at trial. Trials inherently are about deciding issues in

dispute. The Trial Court was not required to afford equal or greater weight to evidence favorable to Plaintiffs. There is no hint that the Trial Court deferred to the jury. The Trial Court properly exercised its role as thirteenth juror.

As part of their argument on this issue, Plaintiffs contend further that no material evidence supports the specific allocation of fault found by the jury of 80% to Golden and 20% to Powers. Regarding such challenges, this Court has discussed:

> Challenging a jury's allocation of fault is the legal equivalent of a "Hail Mary" pass. The comparison and allocation of fault is for the jury, and appellate courts will not second-guess a jury's allocation of fault if it is supported by any material evidence. The process of ascertaining whether evidentiary support exists for a jury's verdict is very deferential toward the verdict.

*Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 204 (Tenn. Ct. App. 2008) (citations omitted).

As stated in *Duran*, challenges to a jury's allocation of fault are a longshot. The standard is quite deferential. Evidence was presented at trial showing, among other things, that Golden went jogging in the dark with her back to traffic on the wrong side of the road, that she jogged out into the highway without the benefit of a crosswalk, that she continued running in the right side lane, and that Powers was driving at or below the speed limit. All of this constitutes material evidence from which the jury could conclude that Golden was 80% at fault for this unfortunate incident. The Trial Court acted properly as thirteenth juror, and material evidence supports the jury's allocation of fault.

The next and final issue we address is whether the Trial Court erred by denying Plaintiffs' motion for a new trial. Plaintiffs' argument here centers on a claim of jury prejudice, and Plaintiffs put forward several alleged examples: (1) the figure of $300,000 arrived at by the jury for damages was so low as to indicate compromise; (2) that irrelevant evidence was introduced regarding Plaintiffs' wealth; (3) that Powers' expert was from Hawkins County and Plaintiffs' expert was from Miami, and that the only non-party witness to the collision was a local who once worked with Powers; (4) that the jurors were swayed improperly by Powers' counsel urging them not to "punish" her client and that the Trial Court's curative instructions were insufficient; and, (5) a question raised by a juror regarding how Golden even got to where she was jogging.

With respect to when an inadequate verdict shows prejudice on the part of a jury, this Court has stated: "'[W]here the verdict of the jury is so grossly inadequate in comparison with the injuries actually sustained and proven as to evince passion, prejudice

-11-

or unaccountable caprice on the part of the jury . . . the appellate courts will look into the facts and set the verdict aside.'" *Naraghian v. Wilson*, 515 S.W.3d 323, 329 (Tenn. Ct. App. 2015) (quoting *Flexer v. Crawley*, 269 S.W.2d 598, 600 (Tenn. Ct. App. 1953)). Regarding evidentiary decisions, "trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). Regarding inappropriate statements made by counsel and the effect of curative instructions, this Court has discussed:

> "Statements made by counsel can be cured by the use of curative instructions." *Oldham v. Pickett*, No. 01-A-01-9211-CV00441, 1993 WL 95590, at *2 (Tenn. Ct. App. Apr. 2, 1993) (citing *Mitchell v. Jennings*, 836 S.W.2d 575, 581 (Tenn. App. 1992)). "Whether to give a curative instruction under the circumstances is a matter within the trial court's discretion." *Marshall v. Cintas Corp.*, 255 S.W.3d 60, 75 (Tenn. Ct. App. 2007) (citing *State ex rel. Farmer v. City of Townsend*, No. 03A01-9306-CV-00200, 1993 WL 460336, at *2 (Tenn. Ct. App. Nov. 8, 1993). "On appellate review, we must presume that the jury has followed [the trial court's] instruction." *Payne v. CSX Transportation, Inc.*, 467 S.W.3d 413, 443 (Tenn. 2015) (citing *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 375 (Tenn. 2006)). "A verdict is not overturned on appeal on this basis unless, 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Marshall*, 255 S.W.3d at 75 (quoting Tenn. R. App. P. 36(b)).

*Bradley v. Bishop*, 538 S.W.3d 518, 534 (Tenn. Ct. App. 2017).

We address each of Plaintiffs' arguments in turn, beginning with that concerning damages. While Plaintiffs assert that the figure of $300,000 arrived at by the jury was unreasonably low and thus evidence of compromise, they do not state what the minimum amount of reasonable damages in this case should be above which an award would not show prejudice. The jury found damages to be approximately $60,000 over Golden's stipulated medical expenses. Given all the proof presented to the jury, including Golden's serious injuries and her recovery, we cannot find the damages verdict to be so grossly inadequate as to show prejudice by the jury. This being so, we find no trace of prejudice either by or in the jury's determination of damages.

Plaintiffs contend also that they were painted as wealthy out-of-towners through irrelevant evidence concerning their financial means. For instance, during Rice's cross-examination, it emerged that Plaintiffs had a nanny, housekeeper, and other hired

assistance at their home. In response, Powers observes that Rice alleged the loss of support of his wife, and that such evidence went to whether Golden was able to care for her family while recovering from her injuries. Powers is correct that this evidence is relevant to Rice's claim. Moreover, we do not believe that the jury's mere knowledge that Plaintiffs are of some financial means, and in particular that they can afford to hire domestic assistance, was so damaging as to render the jury prejudiced against Plaintiffs and unable to fairly decide the question before it. A financial difference between the parties to a lawsuit is not an unusual occurrence, and is something juries often face.

Plaintiffs' claim that local bias permeated the trial is unavailing, as well. There is no evidence of such bias. In addition, Plaintiffs chose to file suit in Hawkins County, Tennessee where the accident happened. They also chose to retain an expert from Miami. The fact that the only non-party witness to the accident was Powers' former co-worker is just a fact of the case; it cannot be changed. Adopting Plaintiffs' position here would be akin to having a presumption of prejudice by a jury against an out of county party when the other party and witnesses are in county. This is not an unusual situation at trial. We decline to adopt Plaintiffs' position.

Continuing with Plaintiffs' alleged examples of prejudice, Plaintiffs argue that the jury was swayed improperly by Powers' lawyer urging it not to "punish" her client. We agree that the use of the term "punish" was inappropriate. However, the Trial Court, with agreement from the parties, issued a curative instruction. The Trial Court instructed the jury: "You are not to get the impression that the plaintiff is bringing this suit intending to punish the defendant in any way. Plaintiffs are not seeking any punitive damages. What they are seeking is compensatory damages." We find nothing in the record to suggest that this instruction went unheeded. We further find no reversible error in the Trial Court's exclusion of evidence concerning Powers' bankruptcy as it was not relevant to the issues at trial.

As a final matter, Plaintiffs cite as evidence of bias a juror question about how Golden even got to where she was jogging. The question was: "Devils Nose Road to 70 is dark and dangerous! How did she get out that road without anything happening? There is bears, snakes, deer, and turkey. I would not walk that road in daytime without a gun." Plaintiffs state that the question shows that the jury decided to reach a verdict against them from the outset just because Golden had decided to go jogging in the dark. In our judgment, the juror's question—perhaps more of a comment—does not reveal prejudice. The question does not speak badly of Golden or purport to judge liability or fault as to the accident; it merely asks in a rambling fashion how she got to where she was, and states that the area is dangerous because of "bears, snakes, deer, and turkey."

-13-

Plaintiffs' contentions of jury prejudice are speculative, at best. Nothing in this record reflects that the jury reached its verdict on any improper basis. The record reflects, instead, that Plaintiffs received a fair trial and simply lost. We find no abuse of discretion in the Trial Court's denial of Plaintiffs' motion for a new trial. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Joanna L. Golden and Douglas K. Rice, and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE